Robert H. WILLIAMS, Melissa B. Williams, Danielle Hope Williams, Kristen Joy Williams, and Stephanie Faith Williams, Appellants,

v.

Greg GLEASON, Beth Gleason, Robert L. Roane, Andrew W. Edwards, William R. Stuck, Neal T. Hare, Thomas W. Hartnett, Jr., Robert E. Stewart, Harold P. Tolsma, William A. Fitzhenry, David Lee Wakeland, Gordon E. Landreth, Irvin M. May, Jr., Robert Charles Bishop, James C. Bland, Donald L. German, E.R. McDaniel, Lawrence S. Ruddell, Michael L. Wilson, and Fred R. Williard, Appellees.

No. 14–98–00050–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

May 18, 2000.

Rehearing Overruled Aug. 17, 2000.

Robert H. Williams, Houston, for appellants.

James S. Sharpe, Fort Worth, H. Victor Thomas, Steven C. Howard, Houston, for appellees.

Panel consists of Justices SEARS, CANNON, and DRAUGHN.*

## OPINION

JOE L. DRAUGHN, Justice (Assigned).

The principal question in this appeal is whether we have subject matter jurisdiction to decide an ecclesiastical dispute. We find we do not, and affirm the trial court's judgment.

This dispute arose during a disciplinary action brought by the church's elders against Mr. and Mrs. Williams. The Williamses sued the elders for libel, slander, intentional infliction of emotional distress, breach of trust, breach of fiduciary and other responsibilities, negligence, false imprisonment, malicious prosecution, conspiracy, extortion and blackmail, tortious interference with business and/or occupations, R.I.C.O. violations, false and misleading advertising and fraud, and denial of due process. Each defendant answered and filed special exceptions and subsequently moved for summary judgment, arguing the trial court lacked subject matter jurisdiction to hear this ecclesiastical dispute. The Williamses filed a written summary judgment response, without any summary judgment evidence.[1] The trial court granted the summary judgment.

---

* Senior Justices Ross A. Sears, Bill Cannon, and Joe L. Draughn sitting by assignment.

1. Appellant stated in their summary judgment response:

The Williamses appeal in twenty-seven points of error the trial court's grant of summary judgment. We affirm the trial court's judgment.

We will use the usual standard of review in considering whether the trial court erred in granting the summary judgment:

1. The movant for summary judgment has a burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

2. In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true.

3. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.

*Nixon v. Mr. Property Management*, 690 S.W.2d 546, 548–49 (Tex.1985); McDONALD & CARLSON, TEXAS CIVIL PRACTICE GUIDE 2d § 28.21 (1998).

### Background

Robert H. Williams, his wife Melissa, and their children, Danielle, Kristen, and Stephanie, were members of the Covenant Presbyterian Church where Robert taught Sunday School. When they became members of the church, the Williamses vowed to submit themselves to the government and discipline of the church.

During one of his Sunday School lessons, Robert gave a lesson on the meaning of the Biblical verses contained in Romans 7:14–25.[2] After learning of Robert's interpretation, which was different than that espoused by the Presbyterian Church, certain church elders questioned Robert about the subject. Although they did not remove Robert from his teaching position, they instructed him not to teach anything contrary to the established doctrines of the church. The Elders advised Robert he "was not under any formal disapproval, censorship, or other action" and was considered to be "a fully approved and participating member of the congregation."

After the Elders met with the Williamses, Robert and his wife brought a complaint with the local church's judiciary, the Session, against Ruling Elders Bill Stuck and Andy Edwards and Teaching Elder (Minister and Pastor) Bob Roane.[3] The Session held a meeting where the

---

Plaintiffs continue to this moment to simply get the chance to come into this Court for a first chance at redress and justice and a righting of gross wrongs done to them by Defendants over the last two years.

2. The King James Version of Romans 7:14–25 states:

For we know that the law is spiritual: but I am carnal, sold under sin. For that which I do I allow not: for what I would, that do I not; but what I hate, that do I. If then I do that which I would not, I consent unto the law that it is good. Now then it is no more I that do it, but sin that dwelleth in me. For I know that in me (that is, in my flesh,) dwelleth no good thing: for to will is present with me; but how to perform that which is good I find not. For the good that I would do not: but the evil which I would not, that I do.

Now if I do that I would not, it is no more I that do it, but sin that dwelleth in me. I find then a law, that, when I would do good, evil is present with me. For I delight in the law of God after the inward man: But I see another law in my members, warring against the law of my mind, and bringing me into captivity to the law of sin which is in my members.

O wretched man that I am! who shall deliver me from the body of this death? I thank God through Jesus Christ our Lord. So then with the mind I myself serve the law of God; but with the flesh the law of sin.

3. The collective charges were as follows:

1. Being an accuser of the brethren;
2. Rejection of discipline and admonition
3. Partiality; maintaining two sets of weights;
4. Pre-judgment and prejudice; hurrying to a decision before all testimony is taken or heard.
5. Hypocrisy
6. Tolerating and feeding a seared conscience.
7. Showing disdain for and profaning the high standards of Christ's under-shepards (elders).

Williamses presented evidence and arguments in support of their complaints. The Session appointed an *ad hoc* commission to investigate these complaints and found insufficient evidence to warrant censure of any of the accused elders. The decision of the Session was reported to the congregation of the church without mentioning any names.

Robert and Melissa appealed the Session's finding to the next level of the church judiciary, the Presbytery of South Texas of the Presbyterian Church of America. The Judicial Business Committee of the Presbytery reviewed their complaint against the Session and unanimously found no basis for the complaint. Later, the full Presbytery approved and adopted the Judicial Business Committee's decision. Robert and Melissa have appealed the Presbytery's decision to the Standing Judicial Committee, the highest court in the denomination, whose decision on this matter is not in the record.

While the Wiliamses' case was on appeal in the church courts, Covenant's Session brought its own disciplinary action against Robert and Melissa for breaking their membership vows and other misconduct, including making false, libelous, and misleading statements against the church Elders. The Session held a trial of the charges against the Williamses. The Williamses were present at the trial, but voluntarily declined to participate. After the trial, the Session voted to temporarily prohibit the Williamses from participating in the Church's sacrament of communion. The Williamses have appealed the Session's decision to the Presbytery of South Texas.

During the pendency of the church appeal, Robert occasionally preached at Christ Evangelical Presbyterian Church. Beth Gleason, wife of Greg Gleason, a deacon of Covenant, left a telephone message with Dr. Bob Peterson, of Christ Evangelical Presbyterian Church, regarding the qualifications required for a person to preach at an Evangelical Presbyterian Church. Beth Gleason never mentioned the Williamses in this phone message. Bob Peterson did not personally return the call, rather his secretary called to inform Mrs. Gleason he would not be able to help her.

Additionally, the Gleasons also accused the Williamses of sinning "by sowing seeds of discord among the brethren at Covenant."[4]

---

4. The entire text of the letter is set out as follows:

Dear Bob and Melissa:

We are writing you somewhat belatedly to tell you that we feel that you have sinned by sowing seeds of discord among the brethren at Covenant Presbyterian Church in America and asking you to repent of your sin.

*Proverbs 6:16–19*

These six things the LORD hates,
Yes, seven are an abomination to Him:
[17] A proud look,
A lying tongue,
Hands that shed innocent blood,
[18] A heart that devises wicked plans,
Feet that are swift in running to evil,
[19] A false witness who speaks lies,
And one who sows discord among brethren.

We have personally seen the fruit of these seeds among others and within ourselves as emotions have been near the breaking point at times. You have discussed your differences with the Session of Covenant with individuals who were never witnesses to any of the incidents as a part of your endeavor to sow these seeds of discord. Furthermore, while the session at Covenant was trying to handle the matter discreetly, you sent out a letter (to those in the church and others who are not even members of our church) broadcasting your point of view, which was a violation of your oath to God taken before the congregation that you would support the "purity and peace of the church." We ask you now to repent of this sin and to cease in this behavior, if you have not already. We also ask your forgiveness in not confronting you previously with your sinfulness and allowing you to continue in your sinful ways. We have written this letter out of a sense of duty to tell a brother and sister that failure to repent may put your very souls in jeopardy.

We will look for your response in the mail. If we do not hear from you or if you are unwilling to repent, the next time we greet you we will ask you if you have repented yet and will pursue no other discussions with you.

### The Controversy

The Williamses filed this suit against both the members of Covenant's Session and the officers of the Presbytery of South Texas who reviewed the Session's judicial determinations. The Williamses alleged each appellee was liable in the amount of five million dollars for: (1) libeling the Williamses through the statements contained in an instrument through which Church disciplinary charges were made against the Williamses; (2) libeling the Williamses through the statements contained in a September 11, 1996 letter from the Session to the Williamses concerning the inflammatory language used by the Williamses;[5] (3) failing to follow the Church's own constitutional rules in the trial of the Williamses; (4) refusing the Williamses' request to have copies of the trial evidence and a transcript of the trial sent to them; (5) denying the Williamses' rights to: (a) cross-examine their accusers, (b) bring witnesses to corroborate their story, (c) allow a recording of the trial to be made, and (d) receive file stamp copies of their pleas and objections to the trial; (6) libeling the Williamses through a letter sent by the Clerk of the Session, William Stuck, to Ian Coulter, leader of the "Church Without Walls" ministry, which is sponsored by the Covenant Presbyterian Church; and (7) interfering with the Williamses attempt to join a church in a sister denomination.

The Williamses also alleged Greg and Beth Gleason and his wife attempted to interfere with Mr. Williams's opportunity to preach at another church and of writing a libelous letter to the Williamses attacking their character.

### Ecclesiastical Abstention

■ The First Amendment of the United States Constitution, applied to the states through the Fourteenth Amendment, provides: "Congress shall make no law respecting an establishment of Religion, or prohibiting the free exercise thereof." U.S. CONST. amend. I, XIV; *see Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The Constitution forbids the government from interfering with the right of hierarchical religious bodies to establish their own internal rules and regulations and to create tribunals for adjudicating disputes over religious matters. *See Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 708–709, 724–25, 96 S.Ct. 2372, 2380, 2387–88, 49 L.Ed.2d 151 (1976); *Libhart v. Copeland*, 949 S.W.2d 783, 793 (Tex.App.-Waco 1997, no pet.); *Tran v. Fiorenza*, 934 S.W.2d 740, 743 (Tex.App.-Houston [1st Dist.] 1996, no writ); *see also Diocese of Galveston–Houston v. Stone*, 892 S.W.2d 169, 179 (Tex.App.-Houston [14th Dist.] 1994, orig. proceeding) (Sears, J., dissenting)("Religious controversies are not the proper subject of civil court inquiry.").

■ Following this constitutional mandate, civil courts may not intrude into the church's governance of "religious" or "ecclesiastical" matters, such as theological controversy, church discipline, ecclesiastical government, or the conformity of members to standards of morality. *See Tran*,

Yours in Christ

**5.** Regarding their libel claim, the Williamses stated:

The entire ecclesiastical "kangaroo court, KKK or KGB type of Salem witch hunt trial" process unmistakably and undeniably created out of malice by the Defendants, not only out of thin air, but more importantly, in contradiction, contravention, violation, and rebellion against their own good and wise and proper PCA ecclesiastical Constitution and its manifold wise, proper, unambiguous, guaranteed and specifically enumerated protections was and is further proof of not only that the entire normal ecclesiastical process was subverted by Defendants contrary to their own good and wise PCA Constitution, but also for the purpose of subverting the entire process to a commission of libel and other torts they committed with impunity, and continue to do so to this day, while cowardly hoping to stand behind the cloak of a Constitution and rules and denomination that they mocked, denied, violated, subverted, ignored, and threatened the very existence of, by hijacking and subverting the normal, decent, and proper process to their own tortious ends.

934 S.W.2d at 743. Although wrongs may exist in the ecclesiastical setting, and although the administration of the church may be inadequate to provide a remedy, the preservation of the free exercise of religion is deemed so important a principle it overshadows the inequities that may result from its liberal application. *See id.; Dean v. Alford,* 994 S.W.2d 392, 395 (Tex. App.-Fort Worth 1999, no pet.). Because churches, their congregations, and hierarchy exist and function within the civil community, they are also amenable to rules governing property rights, torts, and criminal conduct. *See Watson v. Jones,* 80 U.S. (13 Wall.) 679, 732–33, 20 L.Ed. 666 (1871); *Brown v. Clark,* 102 Tex. 323, 331–32, 116 S.W. 360, 363 (1909); *Libhart,* 949 S.W.2d at 793.

Whether this suit is ecclesiastical, or concerns property rights, torts, or criminal conduct, is determined by first examining the substance and effect of the Williamses' petition—without considering what they use as claims—to determine its ecclesiastical implication. *See Tran,* 934 S.W.2d at 743; *Green v. United Pentecostal Church Int'l,* 899 S.W.2d 28, 30 (Tex. App.-Austin 1995, writ denied); *see also Patterson v. Southwestern Baptist Theological Seminary,* 858 S.W.2d 602, 605–06 (Tex.App.-Fort Worth 1993, no writ). Although the Williamses argue their claims arise in tort, we find that each claim implicates an ecclesiastical matter, namely their subjection to the church's discipline.

Instead of suing the church for its disciplinary actions, which would have provided the church with ecclesiastical immunity, the Williamses have sued members of the church conducting their disciplinary trial and appeal. Ecclesiastical immunity would be an empty protection if a disgruntled member, denied the chance to sue the

religious body, sued instead the members of the religious body who disciplined him. If disciplined members were able to sue the members of the church, as opposed to the church itself, there would be an inappropriate chilling effect on the ability of churches to discipline their members. *See* Morken, *Church Discipline and Civil Tort Claims,* 28 IDAHO L.REV. 93, 94 (1991). Any such chilling effect would deteriorate the "high and impregnable" wall separating church and state and can not be tolerated. *See Everson v. Board of Education of Ewing Tp.,* 330 U.S. 1, 15–16, 67 S.Ct. 504, 91 L.Ed. 711 (1947) ("The First Amendment has erected a wall between church and state. That wall must be kept high and impregnable. We could not approve the slightest breach."). "The Free Exercise Clause [of the First Amendment] prohibits civil courts from inquiring into any phase of ecclesiastical decision making—its merits as well as procedure." *Hadnot v. Shaw,* 826 P.2d 978, 987–88 (Okla.1992). Additionally, the Free Exercise Clause provides a "shield from interference by secular inquest" into a church's or its leaders' implementation of its valid ecclesiastical judicature. *Id.; see Brown,* 102 Tex. at 332, 116 S.W. at 363 ("[W]henever the question of discipline or of faith or ecclesiastical rule, custom or law have been decided by the highest of the[ ] church judicatories to which the matter has been carried, the legal tribunals must accept as final, and as binding on them, in their application to the case before them."). Accordingly, members may not involve the state in ecclesiastical government by improperly using the civil justice system to review an ecclesiastical judicatory's action.[6]

Thus, because appellant's entire suit would require us to review the ecclesiastical judicial process and to determine

---

6. In *O'Connor v. Diocese of Honolulu,* 77 Hawai'i 383, 885 P.2d 361 (Hawai'i 1994), the Hawai'i Supreme Court held the First Amendment removed any authority from civil courts to resolve disputes that turn on matters of church doctrine, practice or polity, or administration that cannot be decided without re-

solving underlying controversies over such matters. *See id.* at 371. O'Connor sued the local Bishop after being excommunicated claiming numerous causes of action, including defamation, fraud, negligence, and deceptive acts and practices. *See id.* at 362. The Court decided these claims would require res-

the efficacy of the parties' religious beliefs and practices, we find we are without jurisdiction to decide this suit.[7] *See Tilton v. Marshall*, 925 S.W.2d 672, 678 (Tex.1996) ("To avoid conducting 'heresy trials,' courts may not adjudicate the truth or falsity of religious doctrines or beliefs."); *Green*, 899 S.W.2d at 30; *Hughes v. Keeling*, 198 S.W.2d 779, 783 (Tex.Civ.App.— Beaumont 1946, no writ).

Because the genesis of this lawsuit implicates and, is permeated throughout by, what is essentially an ecclesiastical dispute, we are constitutionally prohibited from exercising jurisdiction over it.

Accordingly, we affirm the judgment of the trial court.

olution of controversies over church doctrine, law or polity and would be a matter beyond the purview of the court. *See Davis v. Church of Jesus Christ of Latter Day Saints*, 258 Mont. 286, 852 P.2d 640 (1993) (Court held it was impossible to evaluate church discipline because it would involve an impermissible analysis of religious beliefs and practices.); *Guinn v. Church of Christ of Collinsville*, 775 P.2d 766, 772 (Okla.1989) ("If members of religious organizations could freely pursue their doctrinal grievances in civil courts, ... ecclesiastical liberty would be subjected to governmental interference and the 'unmolested and unobstructed' development of opinion and belief which the First Amendment was designed to foster would be secularly undermined.").

7. Although this case was dismissed through summary judgment procedure, we note that lack of jurisdiction to decide a question may be determined using a plea to the jurisdiction. *See Texas Department of Transp. v. Jones*, 8 S.W.3d 636, 638–39 (Tex.1999) (Immunity from suit raises a jurisdictional bar, defeats a trial court's subject matter jurisdiction and is properly asserted in a plea to the jurisdiction.).