TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-10-00376-CV






Kenneth Becker, Appellant


v.


Carla Hahn Clardy, Appellee






FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT

NO. 230,807-B, HONORABLE RICK MORRIS, JUDGE PRESIDING



 


M E M O R A N D U M O P I N I O N



 Appellant Kenneth Becker appeals the trial court's order sustaining appellee
Carla Hahn Clardy's plea to the jurisdiction. In his petition, Becker sought damages based upon
common law claims of libel and slander against Clardy. Clardy responded in her plea that the
trial court did not have subject matter jurisdiction over Becker's claims because they fell within the
ecclesiastical abstention doctrine (the "Doctrine"). (1) Because we conclude that the Doctrine applies
to Becker's claims, we affirm the trial court's order sustaining the plea and dismissing Becker's
claims for lack of subject matter jurisdiction.


BACKGROUND


 During the relevant time period, Becker and Clardy were employed as religion
teachers at St. Mary's School in Temple, Texas. The school is within the Diocese of Austin, Texas,
and part of the Catholic Church. As teachers of the school, both Becker and Clardy were subject
to the "Diocese of Austin Policies on Ethics and Integrity in Ministry" (the "Policy"). (2) The Policy
prohibits church personnel "from engaging in . . . immoral conduct" which is defined as "[c]onduct
that is contrary to the discipline and teachings of the Catholic Church and which may result in
scandal to the faithful or harm to the ministry of the Catholic Church." The Policy also prohibits
church personnel from "harm[ing] the reputation of others by . . . disclosing without legitimate cause
the faults or failings of others to persons who have no cause to know them [or by] making false
allegations against another."

 The Policy sets forth a code of ethics for church personnel and a procedure for
reporting, investigating, and disciplining church personnel for misconduct. The code provides that
church personnel "shall exhibit the highest Christian ethical standards and personal integrity," "shall
conduct themselves in a manner that is consistent with the discipline, norms, and teachings of the
Catholic Church," "shall provide a professional work environment that is free from harassment," and
"shall share concerns about suspicious or inappropriate behavior with their pastor, their principal,
the chancellor or Bishop Gregory Aymond."

 Consistent with the Policy, Becker sent a written statement in February 2008 to the
principal of the school, copying the pastor and the superintendent of the Diocese of Austin. Becker
stated that two students "informed" him that Clardy made "adverse or negative comments" about
him in front of students in her religion class. She allegedly told her students that Becker had written
"hate mail," caused Clardy's son to "run away" from Becker's class, and "something about [Becker]
following (male) students into the (school) restroom." He further stated that he "consider[ed]
Mrs. Clardy's actions and spoken words to be a violation of the Canon Law and a professional code
of ethics," "malicious and not in keeping with the teachings of Jesus Christ, in loving thy neighbor
as thy self, the precepts of the Catholic faith and Canon Law (Canon 802 § 2)," and "defamation
of character and harassment." He then stated his "[e]xpectations" that the pastor and principal
"immediately, thoroughly, and quickly" investigate and, if the allegations were true, "immediately"
terminate Clardy and require Clardy to apologize. He sought an oral apology in the presence of
the eighth grade class, the principal, the pastor, and Becker and a written apology to Becker "and
the faculty and staff of St. Mary's school." The principal and pastor conducted an investigation, but
Clardy resigned and the investigation stopped. (3)

 Becker then filed this suit against Clardy in July 2008. In his petition, Becker alleged
that Clardy "made numerous untrue and defamatory statements about Plaintiff, to students,
administrators, faculty and/or parents." The alleged slanderous statements were: (i) Becker "had
something to do with [a teacher] being fired," (ii) Becker "has a 'hit list' of teachers' names that he
wants to target," (iii) Becker "has sent Clardy 'hate mail,'" (iv) Becker "caused Clardy's son to run
away from school," and (v) Becker "was the reason Clardy was fired from St. Mary's School." As
to his libel claim, Becker alleged that Clardy "communicated . . . defamatory remarks in writing."
The alleged published statements, including statements to Becker's "superiors," were that: 
(i) Becker "humiliated a 6th grade student during Stations," (ii) "Clardy had serious concerns
regarding her son's emotional and spiritual well-being" in Becker's class, and (iii) Becker was
"harassing" Clardy and "created a hostile work environment."

 Clardy filed a plea to the jurisdiction contending that the trial court lacked jurisdiction
because the statements and events alleged by Becker fell within the ecclesiastical abstention doctrine.
The trial court held an evidentiary hearing on the plea. Clardy's evidence included excerpts from
the oral deposition of the principal, a copy of the Policy, Becker's written statement in February 2008
to the principal, and excerpts from Becker's oral deposition. Becker filed a response to the plea,
but he did not present evidence at the hearing. After the hearing, the trial court signed an order
sustaining Clardy's plea to the jurisdiction and dismissing the case. This appeal followed.


ANALYSIS


Standard of Review

 "Lack of jurisdiction may be raised by a plea to the jurisdiction when religious-liberty
grounds form the basis of the jurisdictional challenge." See Westbrook v. Penley, 231 S.W.3d 389,
394 (Tex. 2007). We review a plea questioning the trial court's subject matter jurisdiction de novo.
See Texas Dep't of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 226 (Tex. 2004). We focus first
on the plaintiff's petition to determine whether the facts that were pled affirmatively demonstrate
that subject matter jurisdiction exists. Id. at 226. We construe the pleadings liberally in favor of
the plaintiff. Id. If a plea to the jurisdiction challenges the existence of jurisdictional facts, the
trial court may consider evidence and must do so when necessary to resolve the jurisdictional issues
raised. Id. at 227; Bland Indep. Sch. Dist. v. Blue, 34 S.W.3d 547, 555 (Tex. 2000).



The Ecclesiastical Abstention Doctrine

 Becker's sole issue is whether the trial court correctly determined that it lacked
subject matter jurisdiction based upon the ecclesiastical abstention doctrine. The Doctrine
"prevents secular courts from reviewing many types of disputes that would require an analysis
of 'theological controversy, church discipline, ecclesiastical government, or the conformity of
the members of the church to the standard of morals required.'" Patton v. Jones, 212 S.W.3d 541,
547-48 (Tex. App.--Austin 2006, pet. denied) (quoting Watson v. Jones, 80 U.S. 679, 733
(1872)); see Westbrook, 231 S.W.3d at 397-98; In re Godwin, 293 S.W.3d 742, 747-48
(Tex. App.--San Antonio 2009, orig. proceeding); Williams v. Gleason, 26 S.W.3d 54, 58
(Tex. App.--Houston [14th Dist.] 2000, pet. denied). "[C]ivil courts are to accept 'as final,
and as binding on them' the decisions of an ecclesiastical institution on such matters." Patton,
212 S.W.3d at 547 (quoting Watson, 80 U.S. at 728). 

 The Doctrine arises from the Free Exercise Clause of the First Amendment of the
Constitution and applies to the states through the Fourteenth Amendment. See U.S. Const. amends. I
("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise
thereof." ), XIV. Among its prohibitions, the Free Exercise Clause precludes government action that
burdens the free exercise of religion "by encroaching on the church's ability to manage its internal
affairs." Westbrook, 231 S.W.3d at 395. "Although wrongs may exist in the ecclesiastical setting,
and although the administration of the church may be inadequate to provide a remedy, the
preservation of the free exercise of religion is deemed so important a principle that it overshadows
the inequities that may result from its application." Williams, 26 S.W.3d at 59 (citation omitted);
see In re Godwin, 293 S.W.3d at 750 (courts give "great deference to the First Amendment's
freedom of religion guarantee"). To determine whether the Doctrine applies, courts consider
the "substance and nature" of the plaintiff's claims and the effect of a judicial resolution, and
not whether wrongs may go unaddressed. See In re Godwin, 293 S.W.3d at 750 (court considers
substance and effect of the claim's resolution by a civil court in determining whether focus of
dispute is on ecclesiastical matters); Patton, 212 S.W.3d at 548. In this context, we turn to Becker's
pleadings and the evidence relevant to the jurisdictional issue. See Miranda, 133 S.W.3d at 227-28. 

 In his petition, Becker seeks damages for alleged defamatory statements. See
Tex. Civ. Prac. & Rem. Code Ann. § 73.001 (West 2011) (elements of libel); WFAA-TV, Inc.
v. McLemore, 978 S.W.2d 568, 571 (Tex. 1998); Turner v. Church of Jesus Christ of Latter-Day
Saints, 18 S.W.3d 877, 902 (Tex. App.--Dallas 2000, pet. denied) (to prove defamation, private
individual "had to show the Church published a false statement and was negligent about the truth
of the statement"). Becker alleged that Clardy made statements to "students, administrators, faculty
and/or parents" and to "superiors" that "were intended to defame [his] character and reputation." 
The complained-of statements concerned Becker's actions as a teacher at the school and addressed
the subjects of teacher discipline and Becker's interaction with students and other teachers. Becker
urges that these statements were purely secular and not ecclesiastical in nature.

 It is true that the Free Exercise Clause does not immunize all tort causes of action.
See Pleasant Glade v. Schubert, 264 S.W.3d 1, 11-12 (Tex. 2008); Tilton v. Marshall, 925 S.W.2d
672, 677 (Tex. 1996). But "even though the elements of a common law tort may be defined by
secular principles without regard to religion, it does not necessarily follow that application of
those principles to impose civil tort liability would not run afoul of protections the constitution
affords to a church's right to construe and administer church doctrine." Schubert, 264 S.W.3d at 10
(citing Westbrook, 231 S.W.3d at 400). Here, the alleged statements and damage to reputation
contained in Becker's pleadings were "confined" to the church community. See Patton, 212 S.W.3d
at 553 (quoting Heard v. Johnson, 810 A.2d 871, 884-85 (D.C. App. 2002)); see id. at 555 n.12
(distinguishing between alleged defamatory remarks to third persons and remarks published to
members of the church community). The evidence presented was conclusive that Becker's claims
were limited to damage to his reputation in the church community based upon alleged statements
made by Clardy to her students and to Becker's "superiors." (4)

 Further, the evidence showed that the substance of Becker's claims was that Clardy
had violated the Policy's code of ethics and moral standards of the Catholic faith and Canon Law.
The Policy sets forth the code of ethics and required moral standards for church personnel, how
church personnel should report "incidents, allegations, and/or concerns," and the procedures for
investigation and the range of disciplinary actions for misconduct, including immoral conduct
or harassment. Actions of church personnel that "may constitute immoral conduct [or] harassment"
"shall be reported" to the pastor, the principal, or certain other identified persons. The procedures
provide the "steps in discipline," including termination, and that "it is the responsibility of
supervisors to address the problem(s) in a timely and equitable manner." The principal's deposition
testimony was that she followed the Policy with respect to the dispute between Becker and Clardy. 

 Whether or not to "impose civil tort liability" against Clardy for harm to Becker's
reputation within the community then necessarily would require an analysis of internal church
matters and doctrine. See Schubert, 264 S.W.3d at 10; In re Godwin, 293 S.W.3d at 750; Patton,
212 S.W.3d at 548; see also Westbrook, 231 S.W.3d at 397 ("It is a core tenant of First Amendment
jurisprudence that, in resolving civil claims, courts must be careful not to intrude upon internal
matters of church governance."); see id. at 400 (alleged defamatory statements could not be "isolated
from the church-disciplinary process"). Whether or not it was true that Becker was the reason for
teachers to be fired "would require an analysis" of the school's "discipline" decisions in the context
of the religious moral standards and church doctrine set forth in the Policy. See Patton, 212 S.W.3d
at 547-48 (citation omitted); see also Westbrook, 231 S.W.3d at 392 ("church discipline" is "core
religious" function); Williams, 26 S.W.3d at 59 ("Although [plaintiffs] argue their claims arise in
tort, we find that each claim implicates an ecclesiastical matter, namely their subjection to the
church's discipline."); Patterson v. Sw. Baptist Theological Seminary, 858 S.W.2d 602, 605-06
(Tex. App.--Fort Worth 1993, no writ) (matter of employment of seminary faculty "could not be
resolved without reference to spiritual meaning of the requirements and guidelines set forth in the
faculty manual"). The truth or falsity of Clardy's other alleged statements and the alleged injury to
Becker's reputation within the church community also would require an analysis of the church's
moral standards and church doctrine. See In re Godwin, 293 S.W.3d at 750; Patton, 212 S.W.3d
at 547-48. Because Becker's alleged harm is limited to the harm to his reputation within the church
community, it is measured against the backdrop of the church's religious morals and principles. (5) 


 Becker urges that his claims do not challenge action by the school because the school
did not reach a decision on whether or not to discipline Clardy. The undisputed evidence, however,
was that the school did make a decision by choosing not to take disciplinary action against Clardy
after she resigned. See Westbrook, 231 S.W.3d at 399 (citing Watson, 80 U.S. at 727) ("A church's
decision to discipline members for conduct considered outside of the church's moral code is
an inherently religious function with which civil courts should not generally interfere."). In his
deposition, Becker agreed that he was subject to the Policy's "terms and conditions." Consistent
with the Policy, Becker advised the principal and pastor of Clardy's alleged statements and set forth
his expectations for how they should handle the matter. He also testified that his expectations did
not get fulfilled to his satisfaction. Becker chose not to sue the school for its lack of action against
Clardy, but brought his claims directly against Clardy. A civil court action resolving Becker's claims
then would encroach on the church's "ability to manage its internal affairs." See Westbrook,
231 S.W.3d at 395; see id. at 399-400 (member of church who submits to the "ecclesiastical power"
cannot later "invoke the supervisory power of the civil tribunals"); Williams, 26 S.W.3d at 59
("[M]embers may not involve the state in ecclesiastical government by improperly using the
civil justice system to review an ecclesiastical judicatory's action."). 

 Becker points to the provision in the Policy that instructs church personnel to contact
police or civil authorities first if "there is an indication of illegal actions by Church personnel." He
urges that this provision shows that the Policy was not meant to be the only source of discipline for
Clardy's behavior. Becker, however, has not asserted that Clardy has taken an illegal act. Further,
in determining whether the Doctrine applies to tort claims, the courts distinguish intentional torts that
endanger public health and safety and that cause physical harm from torts that only cause intangible
or emotional harms. See Westbrook, 231 S.W.3d at 404. Becker does not seek damages for physical
harm but for harm to his reputation within the church community. (6) See Schubert, 264 S.W.3d at 12
("Particularly, when the adherent's claim, as here, involves only intangible, emotional
damages allegedly caused by a sincerely held religious belief, courts must carefully scrutinize the
circumstances so as not to become entangled in a religious dispute.").

 As part of his issue, Becker also contends that the Doctrine applies only to claims
against authority figures in the church or the church itself and, therefore, that it does not apply to
his claims against a fellow member of the community and co-worker. (7) It is true that courts have
applied the Doctrine to claims asserted against church members who are in positions of authority.
See Williams, 26 S.W.3d at 59 ("Ecclesiastical immunity would be an empty protection if a
disgruntled member, denied the chance to sue the religious body, sued instead the members of
the religious body who disciplined him."). The Texas Supreme Court, however, has applied the
Doctrine to tort claims by a church member against other church members who were not in authority
positions. See Schubert, 264 S.W.3d at 12 (holding court lacked jurisdiction to consider church
member's assault claims against other church members). We, therefore, decline to preclude the
application of the Doctrine to Becker's claims on this ground. 


CONCLUSION


 Considering Becker's pleaded claims and the evidence relevant to the jurisdictional
issue, we conclude that the ecclesiastical abstention doctrine applies to Becker's claims. See
Miranda, 133 S.W.3d at 227-28. We therefore overrule Becker's issue and affirm the trial court's
order sustaining Clardy's plea to the jurisdiction and dismissing the case for lack of jurisdiction.



 _____________________________________________

 Melissa Goodwin, Justice

Before Justices Puryear, Henson and Goodwin;

 Dissenting Opinion by Justice Henson


Affirmed


Filed: December 22, 2011
1. See Westbrook v. Penley, 231 S.W.3d 389 (Tex. 2007); In re Godwin, 293 S.W.3d 742
(Tex. App.--San Antonio 2009, orig. proceeding). 
2. The Policy defines "church personnel" to include "[a]ll paid personnel whether employed
in areas of ministry or other kinds of services by the Diocese, its parishes, schools or other agencies." 
3. In his deposition, Becker testified that he attended meetings with the principal and the
pastor concerning his allegations against Clardy but that "everything came to a halt once Mrs. Clardy
resigned."
4. At the hearing, Becker's counsel stated that "this case is focused solely on the effect that
the Defendant's actions had against Mr. Becker's reputation in the community." 
5. The dissent analyzes whether Becker can prevail on a defamation claim; however,
recitation of the elements of defamation is not dispositive. See Pleasant Glade v. Schubert,
264 S.W.3d 1, 11-12 (Tex. 2008) (whether or not "elements of a common law tort may be defined
by secular principles without regard to religion" is not dispositive issue). The "substance and
nature" of Becker's claim--confined to alleged damage to his reputation within the church
community--necessarily requires looking at the "community" and what they believe. See Patton
v. Jones, 212 S.W.3d 541, 547-48 (Tex. App.--Austin 2006, pet. denied) (secular courts precluded
from "reviewing . . . disputes that would require an analysis of . . . 'the conformity of the members
of the church to the standard of morals required'") (citation omitted). 


 The dissent also seems to endorse a piecemeal analysis of whether a particular alleged
defamatory statement is subject to the doctrine. We disagree with this approach and find the analysis
in Williams and In re Godwin instructive. See In re Godwin, 293 S.W.3d at 750; Williams
v. Gleason, 26 S.W.3d 54, 58 (Tex. App.--Houston [14th Dist.] 2000, pet. denied). In both cases,
the plaintiffs asserted defamation among their claims, and the court found their claims subject to the
doctrine by analyzing the overall dispute.


 In In re Godwin, our sister court held that the ecclesiastical abstention doctrine precluded
judicial review of all the plaintiff's claims asserted against a pastor and the pastor's church. The
plaintiff asserted, among his claims, defamation based upon the pastor's statements about the
plaintiff from the "pulpit" including accusing the plaintiff of "bribery." 293 S.W.3d at 746, 748-49.
Whether or not this particular statement was defamatory seemingly could have been determined
without reference to the church's doctrine or affairs but that was not the analysis. The court did not
view this statement separately, instead focusing on the overall dispute to conclude that the plaintiff's
claims "implicate[d] ecclesiastical matters protected from secular review." Id. at 748.

 

 Similarly, in Williams, the court concluded that all of the plaintiffs' claims against
members of the church were precluded by the ecclesiastical abstention doctrine. 26 S.W.3d at 55.
The plaintiffs, among their claims, asserted that two of the defendants "wrote a libelous letter" to the
plaintiffs "attacking their character." In dismissing all claims, the court explained: 


 Whether this suit is ecclesiastical, or concerns property rights, torts, or criminal
conduct, is determined by first examining the substance and effect of the
[plaintiffs'] petition--without considering what they use as claims--to determine its
ecclesiastical implication.


 . . .


 Thus, because appellant's entire suit would require us to review the ecclesiastical
judicial process and to determine the efficacy of the parties' religious beliefs and
practices, we find we are without jurisdiction to decide this suit. 


Id. at 59-60 (emphasis added). Again, the court did not utilize a piecemeal approach, but looked to
the overall controversy to determine if the doctrine applied. 
6. We acknowledge that defamation may be committed in a religious setting. However,
where the alleged damages are limited to damage to reputation within the church community and
measured against the backdrop of religious beliefs and "the standard of morals required," we cannot
intervene. See Patton, 212 S.W.3d at 547-48. 
7. Clardy argues that Becker has not preserved this particular argument. Because we conclude
that the Doctrine applies here, we need not address this additional argument in support of the
trial court's order. See Tex. R. App. P. 47.1.