COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| NORA SALADO, JESUS MARTINEZ, BERTHA PEDREGON, ELSINA AVALOS, NATY RUBALCAVA, RAMON TIRRES, OFELIA MALTOS, ROSA SERNA, LUZ ELENA ABASTA, HERIBERTO ABASTA, PORFIRIO ROJAS, JOSEFINA SALAZAR, PARISHIONERS OF SAN JOSE CATHOLIC CHURCH. | § <br> § <br> § <br> § <br> § | No. 08-22-00204-CV <br><br> Appeal from the <br><br> 243rd Judicial District Court <br><br> of El Paso County, Texas <br><br> (TC# 2020DCV0453) |

Appellants,

v.

ROMAN CATHOLIC DIOCESE OF EL PASO, MARK J. SEITZ, BISHOP OF THE ROMAN CATHOLIC DIOCESE OF EL PASO,

Appellees.

## **O P I N I O N**

This case involves a dispute between a group of parishioners who raised funds to build a new church and the diocese that accepted the funds but ultimately decided not to build the church. Nora Salado, Jesus Martinez, Bertha Pedregon, Elsina Alavos, Naty Rubalcava, Ramon Tirres, Ofelia Maltos, Rosa Serna, Luz Elena Abasta, Heriberto Abasta, Porfirio Rojas, and Josefina Salazar (the Parishioners) sued the Roman Catholic Diocese of El Paso and Bishop Mark J. Seitz (we refer to both Appellees together as the Diocese) alleging promissory estoppel, fraud, violations of the Texas Deceptive Trade Practices Consumer Protection Act (DTPA), and conversion. The

Diocese filed two pleas to the jurisdiction: the first was granted in part, and the second was granted in full. The Parishioners appeal the grant of the second plea to the jurisdiction. We affirm.

## BACKGROUND

On February 5, 2020, the Parishioners filed a lawsuit against Bishop Seitz and the Diocese alleging the misappropriation of church funds and seeking relief in the form of specific performance under the theory of promissory estoppel.[1] The Parishioners alleged their community had raised $1.4 million dollars for the purpose of building a new parish church, and the Diocese then misappropriated the money by refusing to approve the construction of a new church and by extinguishing the San Jose Parish and merging it—and its assets—into a new parish. The Parishioners later amended their pleadings to assert additional claims for fraud, misappropriation of funds, and violations of the DTPA. The Diocese and Bishop Seitz responded with a combined answer, motion to dismiss, and plea to the jurisdiction. The trial court granted the plea to the jurisdiction in part, finding that it lacked jurisdiction to review Bishop Seitz's decision not to build a new church as it involved a matter of internal church governance. The trial court further found it lacked jurisdiction to order Bishop Seitz to authorize the building of a new church or to otherwise grant specific performance.

Bishop Seitz and the Diocese then moved for summary judgment, alleging the statute of limitations for the Parishioners' claims had expired and Bishop Seitz was never properly served. The Parishioners responded, producing an affidavit of Nora Salado, a parishioner from San Jose Parish, who averred that over the past decade leading up to the dispute the Parishioners were repeatedly told the money raised by the Parish was in a "[r]estricted fund" dedicated for "the sole purpose of building a new parish church." She further testified that until Bishop Seitz entered the

---

[1] The original petition attempted to establish a class action under Texas Rule of Civil Procedure 42, however, no order establishing a class was entered.

2

Decree, the Parishioners had continued to hope the funds would be used to build a new parish church. Salado's affidavit was accompanied by a letter dated July 17, 2019, in which Salado wrote to Bishop Seitz and the Supreme Tribunal of the Apostolic Signatura, the highest judicial authority in the Catholic Church, asking the Diocese and the Signatura to reverse the Decree that merged San Jose and Santa Lucia Parishes and to refund the $1.4 million dollars in restricted funds to the Parishioners and donors.

After a hearing on the motion, the trial court granted summary judgment in favor of Bishop Seitz and denied the motion as to the Diocese. While the summary judgment motion was pending, the Parishioners filed a second amended petition on September 23, 2021—renaming Bishop Seitz as a defendant. In it, they alleged the same claims for promissory estoppel, fraud and misappropriation of funds, violations of the DTPA, and adding a claim for conversion.

Specifically, the Parishioners alleged Bishop Raymundo J. Pena and the Diocese approved the construction of a new church building in 1994. In reliance on this alleged promise, the Parishioners held special collections, bazaars, and various other activities to raise $1,404,547.31 for the new church building. According to the Parishioners' pleadings, architectural plans were drawn up and approved by the City of El Paso when Bishop Ochoa, Bishop Pena's successor, left El Paso—delaying construction pending the appointment of a new Bishop.

Bishop Seitz was appointed as the new Bishop and approved the demolition of the old church. The Parishioners alleged after the demolition, Bishop Seitz took conflicting positions regarding whether to approve the construction of a new church. On July 3, 2019, Bishop Seitz issued a Decree (the Decree) disbanding the Parishes of San Jose and Santa Lucia—merging the two into the new Saint John Paul II Parish. The Parishioners' pleadings alleged Bishop Seitz "wrongfully ordered that all assets" of San Jose Parish be transferred to the new Saint John Paul II Parish.

The Church filed its second plea to the jurisdiction alleging the doctrine of ecclesiastical abstention deprived the trial court of subject-matter jurisdiction to resolve the Parishioners' claims. The Diocese included numerous declarations from various church leaders, a copy of the Decree merging San Jose Parish and Santa Lucia Parish, and copies of Salado's internal petition and appeal of the Decree which was denied by the Congregatio Pro Clericis.

The declaration of Most Reverend Raymundo J. Pena stated he was the Bishop of the Diocese of El Paso from June 18, 1980 until May 23, 1995. He testified the Pastor of San Jose Parish asked him to consider constructing a new church on the parish property, but he "never considered that building a new church . . . to be practical and never approved any fund-raising effort for a new church."

The declaration of Most Reverend Armando X. Ochoa stated he was the Bishop of the Diocese of El Paso from June 26, 1996 until December 1, 2011. He testified that at no time during his service to the Diocese did he approve the construction of a new church. Although Most Reverend Ochoa knew the Parishioners desired to construct a new church, he testified doing so was not feasible and he did not give permission to Father Jose Alcocer, the Pastor of the parish, to continue fundraising for the construction of a new church.

The declaration of Bishop Seitz stated he was appointed as Bishop of the Diocese on May 6, 2013. When approached by Father Alcocer asking for approval of the construction of a new church for the San Jose Parish, Bishop Seitz took the issue under advisement. He testified he had to consider the condition of the existing church, the number of families in the parish, the proximity of other parish churches, and the availability of priests and future demographics of the area, and he ultimately decided against approving the project. Also attached to the plea was a letter dated January 28, 2015, from Bishop Seitz to the San Jose Parish in which Bishop Seitz listed concerns related to the construction of a new church—many of which mirror those listed in his sworn

4

declaration. Bishop Seitz's declaration further stated that to best serve the parishioners of San Jose, he offered to approve the use of the building funds to construct a multipurpose building in place of the old church—but the Parishioners refused. After their refusal, Bishop Seitz "decided that the best course would be to take all required canonical steps to merge San Jose Parish with nearby Santa Lucia Parish, to terminate San Jose Parish and Santa Lucia Parish as canonical entities and to create a new canonical entity to be known as Saint John Paul II Parish at the location of the former Santa Lucia Parish." Upon merger, all assets of both San Jose Parish and Santa Lucia Parish would transfer to the new Saint John Paul II Parish and all funds raised by the former San Jose Parish remained on deposit with the Diocesan Investment Trust as of December 31, 2021, the date of Bishop Seitz's declaration.

The declaration of Jorge Vergen, the Executive Director of Catholic Properties of El Paso, stated his responsibilities included overseeing construction projects approved by the Bishop for the Diocese. He testified Bishops Pena and Ochoa "never approved the construction of a new church" for San Jose Parish. Vergen further testified he attended a meeting with Bishop Seitz in June of 2016 when Bishop Seitz informed the Parishioners "he would not approve the construction of a new church." Instead, in August of 2018, Bishop Seitz approved the construction of a new multipurpose building on the San Jose Parish site using the building fund but the Parishioners refused to accept the approved proposal.

The declaration of Reverend Anthony C. Celino, the Pastor of St. Raphael Parish and canon lawyer for the Diocese of El Paso, stated under the Code of Canon Law, a pastor does not have the right to unilaterally declare restricted funds for any purpose. He further averred the expenditure of all funds raised at the parish level is subject to the approval of the bishop, something especially true for matters of construction and church placement "since the decision involves an array of factors such as cost, size of the parish and its financial ability to pay for the proposed or desired

5

project, the demographics of the parish and the availability of priest and nearby churches." Regarding the ownership of the patrimony, Reverend Celino testified canon law provides that in the event the bishop does not approve a proposed project, the funds remain the property of the parish until such time the bishop approves of their expenditure for other parish purposes.

The Diocese's second plea to the jurisdiction argued the Parishioners' complaints required the trial court to adjudicate matters of canon law and internal governance related to the alleged misappropriation of money in the restricted building fund through the promulgation of the Decree. Adjudicating this conflict, the Diocese argued, would require the courts to evaluate the rights, duties, and authority of bishops to merge, create, and transfer assets between parishes and other entities within the hierarchy of the church, all of which are inherently ecclesiastical in nature. Because the Decree was a purely an ecclesiastical act, the Diocese argued that the ecclesiastical abstention doctrine barred all of the Parishioners' claims.

The trial court granted the Diocese's second plea to the jurisdiction as to all claims against it. This appeal followed.

## STANDARD OF REVIEW

A plea to the jurisdiction is a dilatory plea designed to defeat a cause of action based on lack of subject-matter jurisdiction without regards to the merits. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 553–554 (Tex. 2000). Whether a court has subject-matter jurisdiction is a question of law reviewed de novo. *Texas Dept. of Parks and Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). "When a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause. We construe the pleadings liberally in favor of the plaintiffs and look to the pleaders' intent." *Id.* (citations omitted). "[I]f a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional

issues raised, as the trial court is required to do." *Id.* at 227. If the jurisdictional evidence creates a question of fact, the trial court cannot grant the plea and the issue must be resolved by the fact finder. *Id.* at 227–28. The standard for reviewing a plea to the jurisdiction mirrors the standard of review for summary judgments. *Id.* at 228. We therefore take as true all evidence favorable to the plaintiff, indulging reasonable inferences and resolving any doubts in their favor. *Id.*

## ECCLESIASTICAL ABSTENTION

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. CONST. AMEND. I. By virtue of the Fourteenth Amendment, the First Amendment governs conduct of the several states. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). The First Amendment prohibits the government from burdening the free exercise of religion by interfering with matters of church governance. *See, e.g.*, *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 115-16 (1952); *In re Lubbock*, 624 S.W.3d 506, 512-13 (Tex. 2021) (citing *C. L. Westbrook, Jr. v. Penley*, 231 S.W.3d 389, 397 (Tex. 2007)). "It is a core tenet of First Amendment jurisprudence that, in resolving civil claims, courts must be careful not to intrude upon internal matters of church governance[.]" *Westbrook*, 231 S.W.3d at 397. "We follow this limitation in Texas under a doctrine referred to as ecclesiastical abstention." *In re Roman Catholic Diocese of El Paso*, 626 S.W.3d 36, 42 (Tex. App.—El Paso 2021, orig. proceeding) (citing *Masterson v. Diocese of N.W. Texas*, 422 S.W.3d 594, 601 (Tex. 2013)).

While the First Amendment "severely circumscribes" the role that civil courts may play in resolving church-related ecclesiastical disputes, *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969), it does not necessarily bar all claims that may touch upon religious conduct. *Westbrook*, 231 S.W.3d at 396. Courts also have an obligation to resolve disputes and "cannot delegate their judicial prerogative where jurisdiction

exists." *Masterson*, 422 S.W.3d at 606 (courts must "fulfill their constitutional obligation to exercise jurisdiction where it exists, yet refrain from exercising jurisdiction where it does not exist.") Churches and their congregations "exist and function within the civil community," and therefore they are "amenable to rules governing property rights, torts, and criminal conduct." *Williams v. Gleason*, 26 S.W.3d 54, 59 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

As the Texas Supreme Court has noted, the "differences between ecclesiastical and non-ecclesiastical issues will not always be distinct" because many disputes "require courts to analyze church documents and organizational structures to some degree." *Masterson*, 422 S.W.3d at 606; *see also Tran v. Fiorenza*, 934 S.W.2d 740, 743 (Tex. App.—Houston [1st Dist.] 1996, no writ) ("The difficulty comes in determining whether a particular dispute is 'ecclesiastical' or simply a civil law controversy in which church officials happen to be involved."). In so deciding, "courts must look to the substance and effect of a plaintiff's complaint to determine its ecclesiastical implication, not its emblemata." *Tran*, 934 S.W. 2d at 743 (citing *Green v. United Pentecostal Church Int'l*, 899 S.W.2d 28, 30 (Tex. App.—Austin 1995, writ denied); *see also In re Episcopal Sch. of Dallas, Inc.*, 556 S.W.3d 347, 356 (Tex. App.—Dallas 2017, orig. proceeding [mand. denied]) ("[T]he key inquiry is whether a judicial resolution will encroach on the institution's governance and affairs[.]").

One way to distinguish between ecclesiastical and non-ecclesiastical claims is whether the dispute can be resolved on neutral principles of law that will not collide with church doctrine. *Masterson*, 422 S.W.3d at 606; *Episcopal Diocese of Ft. Worth v. Episcopal Church*, 422 S.W.3d 646, 650 (Tex. 2013). For instance, in a church property dispute, the Supreme Court held that where there are no issues of doctrinal controversy involved, a court is constitutional able to adjudicate a dispute using neutral principles of law. *Jones v. Wolf*, 443 U.S. 595, 602–03 (1979). But "[i]f the conflict cannot be resolved solely by the application of neutral principles of law, we

must defer to the decision made by the highest authority of the church from which the question or controversy arises." *Dean v. Alford*, 994 S.W.2d 392, 395 (Tex. App—Ft. Worth 1999, no pet.). Stated another way, if the resolution of the controversy calls the court to interpret or rely on religious precepts or ecclesiastical doctrine, then the First Amendment bars civil adjudication, but if neutral principles of law, standing alone, resolve the dispute, then the court may adjudicate the dispute. *Rodarte v. Apostolic Assembly of the Faith in Christ Jesus*, No. H-10-4181, 2012 WL 12893656, at *3 (S.D. Tex. Feb. 29, 2012) (citing *Jones*, 443 U.S. at 604–06).

## DISCUSSION

The Parishioners second amended pleading asserted claims for promissory estoppel, fraud, violations of the DTPA, and conversion. Whether a suit is ecclesiastical "is determined by first examining the substance and effect of the [plaintiff's] petition—without considering what they use as claims—to determine its ecclesiastical implication." *Williams v. Gleason*, 26 S.W.3d 54, 59 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). "[T] he key inquiry is whether a judicial resolution will encroach on the institution's governance and affairs[.]" *In re Episcopal Sch. of Dallas, Inc.*, 556 S.W.3d at 356.

Here, the fundamental allegation underlying each of the Parishioners' claims is the funds raised by San Jose Parish was misappropriated by the Diocese when Bishop Seitz issued the Decree that the San Jose Parish would cease to exist, and all assets transferred to the newly created Saint John Paul II Parish. Although the Parishioners assert their claims can be resolved by neutral principles of law, we find that each claim implicates an ecclesiastical matter of church organization and governance. The Parishioners' causes of action for promissory estoppel, fraud, violations of the DTPA, and conversion are actually claims for misappropriation of funds—evidenced by their pleadings which seek redress under each cause by stating they seek damages for the misappropriation of the money in the restricted fund.

9

To resolve the dispute of whether the funds raised by the Parishioners on behalf of Sant Jose Parish were misappropriated when they transferred to the new Saint John Paul II Parish would require this Court to interpret Cannon Law and policies of the Roman Catholic Church regarding the rights and authority of bishops regarding the patrimony of a parish. Churches have a fundamental right "to decide for themselves, free from state interference, matters of church government[.]" *Westbrook*, 231 S.W.3d at 397. Because the Parishioners' pleadings affirmatively negate jurisdiction and seek only the resolution of conflict that is purely ecclesiastical, the trial court did not err in granting the Diocese's second plea to the jurisdiction. We overrule the Parishioner's issue on appeal.

## CONCLUSION

The judgment of the trial court is affirmed.


YVONNE T. RODRIGUEZ, Chief Justice

August 2, 2023

Before Rodriguez, C.J., Palafox, Marion, C.J. (Ret.)
Marion, C.J. (Ret.) (sitting by assignment)