**Opinion issued April 30, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00127-CV

———————————

## IN RE ALIEF VIETNAMESE ALLIANCE CHURCH AND PHAN PHUNG HUNG, Relators

---

**Original Proceeding on Petition for Writ of Mandamus**

---

## OPINION

This mandamus proceeding involves a dispute between real party in interest Paul Nguyen, who filed a defamation suit against relators, the Alief Vietnamese Alliance Church and its senior pastor Phan Phung Hung (collectively, "the Church").[1] The Church filed a plea to the jurisdiction, arguing that the trial court

---

[1] The underlying case is *Paul Nguyen v. Alief Vietnamese Alliance Church and Phan Phung Hung*, cause number 2016-53806, pending in the 189th District Court of Harris County, Texas, the Hon. William Burke presiding.

should dismiss the suit under the ecclesiastical abstention doctrine. After the trial court denied the Church's plea, the Church filed this petition for writ of mandamus. In one issue, the Church requests that we grant mandamus relief and order the trial court to vacate its denial of the plea to the jurisdiction and dismiss the suit because the trial court lacks subject-matter jurisdiction under the ecclesiastical abstention doctrine.

We conditionally grant mandamus relief.

### Background

In August 2016, Nguyen filed suit against the Alief Vietnamese Alliance Church—a member church of the Christian & Missionary Alliance (C&MA), a worldwide Protestant denomination—and its senior pastor Phan Phung Hung, asserting a claim of defamation. Nguyen alleged that he was instrumental in starting the Church in 1990 and that, in the years since the Church opened, he has served in various leadership roles, including as a deacon, as the church treasurer, and as an associate pastor. Nguyen alleged that he served as interim pastor during 2011 and 2012, and then the district office of the Christian and Missionary Alliance Vietnamese District—the governing district of the C&MA denomination over the Church—recommended that Hung become the new senior pastor. Hung began serving in this capacity in November 2012.

Nguyen alleged that, at the end of 2014, as his term of serving as secretary of the Church's board and as a deacon was coming to an end, he felt he needed to take a break from ministry, and he decided not to seek re-appointment to leadership positions.[2]

In January 2015, Nguyen's wife, Mai, approached Hung for marital counseling, allegedly telling Hung that she had seen Nguyen having lunch with two female church members and that she was concerned about Nguyen's fidelity. Hung held a meeting at his home with Nguyen and Mai. Nguyen allegedly informed Hung and Mai that he had been asked by the other women to provide marital and spiritual guidance to them and that he was not romantically involved with either woman. Hung suggested that the three of them pray and that they not mention the incident again.

Several months later, in August 2015, Hung and Nguyen began having conflicts concerning issues within the Church, including the proper form of address in Vietnamese for Hung's wife and Hung's decision to take a month-long trip to Vietnam without informing the Church leadership of his plans. Nguyen alleged that,

---

[2] In his deposition, Nguyen testified that he asked Hung to "let [him] step down and take a break" because he had served as Church secretary for five years. At a meeting before the congregation in mid-January 2015, Nguyen told the congregation that he wished to take a break, and he asked the Church members not to vote for him to be in a leadership position. He stated that he did not step down from the secretary position as a form of self-discipline.

during a phone conversation with Hung, Hung stated that Nguyen and Mai had "criticized Pastor Hung's way of pastoring to the members within the Church," that they had "caused emotional hurts" and had offended Hung and other Church members, and that Hung "was tired of dealing with issues related to" Nguyen. In response, Nguyen "decided to take a break from attending the Church."

Nguyen alleged that, after several weeks of his not attending services at the Church, fellow parishioners began questioning Hung about Nguyen's absence, and Hung reportedly told one of the Church officers that Nguyen had "committed adultery with a woman in the church and that is why [Nguyen] was no longer a Deacon and why [Nguyen] did not attend services."

Nguyen further alleged that, at a September 2015 meeting of Vietnamese pastors in Austin, Texas, Hung told the other pastors in attendance that Nguyen was no longer a member or elder of the Church but did not state a reason why. According to Nguyen, one of the pastors at the meeting contacted Nguyen and asked why he was no longer a member of the Church. He alleged that this surprised him because he thought he was still a member.

Hung allegedly also informed the Church board on September 20, 2015, that Nguyen and Mai "were no longer members of the Church as Pastor Hung had terminated [Nguyen] as a member of the Church." Nguyen alleged that Hung also informed all of the deacons of the Church that Nguyen had committed adultery with

4

a fellow Church member. Nguyen also alleged that he contacted members of the C&MA Vietnamese District leadership in an attempt to solve the matter, but the district leadership took no action. Nguyen alleged that he informed the deacon board in October 2015 that Hung had violated the law by slandering him and that he "wanted the Church to be at peace and for things to settle down." Nguyen declined invitations from the Church leadership to meet with the deacons.

Nguyen filed this suit for defamation against the Church and Hung in August 2016. In his suit, Nguyen alleged that his reputation in the Church community, and in the larger Vietnamese Christian community, had been damaged by Hung's statements. He alleged, "[M]ost of the members of the Church, along with other church leaders within the city of Houston and the denomination, have learned of this accusation, which is completely false." Nguyen sought actual and exemplary damages from the Church and Hung.

The Church filed a plea to the jurisdiction, arguing that the trial court lacked subject-matter jurisdiction over the dispute based on the ecclesiastical abstention doctrine. The Church argued that, even if Nguyen's allegations were true, "the disputes identified are replete with issues of church discipline, ecclesiastical government, and the conformity of the members of the church to the standard of morals required of them," matters that courts have repeatedly held should not be addressed in the secular courts. The Church argued that resolving Nguyen's

5

defamation claim would "impinge upon the internal matters of [Church] governance," especially because Nguyen was not just a member of the Church, but had been an associate pastor and a former deacon.

As evidence, the Church attached to its plea to the jurisdiction the bylaws of the C&MA Vietnamese District, as well as the C&MA Manuel, which included, among other topics, procedures for resolving disciplinary matters within the Church. Specifically, the Manual for the C&MA contained a "Uniform Policy on Discipline, Restoration, and Appeal," which applies to all elected personnel of C&MA entities and all members of C&MA churches. The discipline policy states:

> In Matthew 18:15-20 Jesus outlines the steps which should be taken to resolve conflict and exercise redemptive and restorative discipline in the church. The process begins with private conversation. However, if private conversation fails to lead a person to repentance, Jesus commands that we ask other believers to become involved in these conversations. *If he will not listen*, Jesus said, *take one or two others along* (Matthew 18:16). When personal conversations fail to resolve the matter, Jesus instructs us to "tell it to the church." This signals a move to more specifically defined disciplinary procedures outlined in this document.
>
> The C&MA encourages the mediation of personal conflicts whenever such measures are both possible and appropriate. Within the polity of the C&MA, we have purposed to fill Jesus' instructions to exercise church discipline by providing an orderly procedure by which the appropriate ecclesiastical authority may be informed and respond. These disciplinary policies and procedures are implemented only after other appropriate steps have proven ineffective. They also recognize that some sins are of a public nature and cannot be addressed with personal conversation alone.

If an offense is not likely to cause imminent harm to others or to the testimony of Christ, and if the offense is not of such a nature that it would ordinarily disqualify a person from positions of leadership in the Church, the proper ecclesiastical authority may choose to confront an individual entrapped by sin privately to establish the facts and encourage repentance of any sin discovered. If the individual acknowledges his/her sin and repents, the matter may end there, unless a confession to additional people and public or private restitution is needed. In such cases, and when individuals have confessed of their own accord, the proper ecclesiastical authorities may, after an informed investigation, determine the extent and nature of disciplinary actions which may be imposed without a formal disciplinary hearing.

If an individual is unwilling to acknowledge or repent of sin, or if an offense is likely to harm others or lead them into sin, cause division or disruption within the church, or compromise the public testimony of Christ and the C&MA, the proper Church authority shall initiate formal disciplinary procedures as determined by this Policy.

(Emphasis in original.)

The discipline policy sets out formal procedures to be followed in investigating complaints of misconduct. The policy also lists several examples of conduct that can give rise to a disciplinary proceeding, including "[m]oral failure involving sexual misconduct," "[s]preading false rumors about another," and "[c]ausing dissension or division within the church." The policy states that "[d]isciplinary proceedings will be conducted with confidentiality in all aspects of the proceedings; however, there is no guarantee of confidentiality within disciplinary proceedings for any participant" and provides that, in some cases, disclosure of the particular facts might be necessary "in connection with investigating and remedying the charge and considering and carrying out possible restoration."

7

After a visiting judge denied the Church's plea to the jurisdiction, the Church filed a second plea. In addition to the arguments raised in its initial plea to the jurisdiction, the Church also attached Nguyen's deposition as evidence. In his deposition, Nguyen testified that his decision to step away from his leadership positions within the Church in early 2015 was unrelated to Mai's accusation that he had been involved in an adulterous relationship. He testified that, during the January 2015 meeting with Mai and Hung, he repeatedly denied committing adultery, and he stated that he continued to be involved with the Church for several months after that, albeit not in a formal leadership position. Nguyen also testified that, after he learned that Hung had allegedly told Church deacons that Nguyen had committed adultery, he wrote to the district offices seeking their assistance in resolving the matter. Nguyen stated that he brought the underlying lawsuit because the district office failed to act. Nguyen also testified that he sued the Church, in addition to Hung, because members of the deacon board informed members of the Church and at least one former member of the Church that Nguyen had committed adultery.

In response to the Church's second plea to the jurisdiction, Nguyen argued that this case involved Hung's lying about Nguyen's behavior and did not involve matters of church discipline, ecclesiastical government, or conformity of church members to required standards of morals. He argued that the ecclesiastical abstention

8

doctrine "does not prohibit courts from determining a case of defamation where the defendant, who happened to be a pastor, lied to the public about a parishioner."

Hung testified that, from January 2015 through August 2015, he did not inform anyone at the Church about Nguyen's alleged adultery. Hung also testified that he told the adultery allegations to one of the Church board members and his wife "in order to explain to them the reason why [Hung] did not allow [Nguyen] to work in the church." Hung also testified that Nguyen had contacted the Church board members and called Hung dictatorial and had asserted that Hung could not carry out the position of pastor. Hung further testified that, between January and July 2015, the Church did not discipline Nguyen for the alleged adultery, but Nguyen "voluntarily accepted the discipline" by removing himself from the Church board and withdrawing from other leadership roles.

Nguyen also cited excerpts from Hung's deposition and argued that those excerpts were evidence that the conflict that arose between the two men in August 2015 was unrelated to Mai's earlier accusation of adultery, and that it was only after this unrelated conflict had occurred that Hung defamed Nguyen to Church members. Hung stated in his deposition that he and Nguyen had a conflict in August 2015 because Nguyen had told Church members that Hung had asked everyone to refer to his wife by a specific title in Vietnamese, and Hung told Nguyen that when Nguyen "says something untrue like that, it causes a confusion in the church." It was only

9

after the conflicts over issues within the Church arose in August 2015 and Nguyen quit attending services that other Vietnamese pastors and the Church deacons became involved in questioning what had happened and that Nguyen contacted the C&MA Vietnamese District leadership in an attempt to solve the matter. However, Nguyen declined invitations to meet with the Church's leadership and subsequently brought this suit.

The trial court denied the Church's second plea to the jurisdiction, and this mandamus proceeding followed.

## Ecclesiastical Abstention Doctrine

In its sole issue, the Church contends that the trial court clearly abused its discretion when the court denied its plea to the jurisdiction because the ecclesiastical abstention doctrine applies and deprives the court of subject-matter jurisdiction.

### A.     *Mandamus Standard of Review*

Generally, to be entitled to mandamus relief, the relator must demonstrate that the trial court abused its discretion and that it has no adequate remedy by appeal. *See In re J.B. Hunt Transp., Inc.*, 492 S.W.3d 287, 299 (Tex. 2016) (orig. proceeding); *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992) (orig. proceeding). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without regard to guiding legal principles. *In re J.B. Hunt Transp.*, 492 S.W.3d at 293–94 (quoting *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998)). A trial court has no discretion in

10

determining what the law is or in applying the law to the facts. *Id.* at 294 (citing *Walker*, 827 S.W.2d at 840). Thus, the trial court's failure to analyze or apply the law correctly constitutes an abuse of discretion. *In re Nationwide Ins. Co. of Am.*, 494 S.W.3d 708, 712 (Tex. 2016) (orig. proceeding).

A plea questioning the trial court's subject-matter jurisdiction over a dispute raises a question of law that we review de novo. *Westbrook v. Penley*, 231 S.W.3d 389, 394 (Tex. 2007) (citing *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004)). A party may raise lack of subject-matter jurisdiction via a plea to the jurisdiction "when religious-liberty grounds form the basis for the jurisdictional challenge." *Id.* We first look to the plaintiff's pleadings to determine whether the facts pleaded affirmatively demonstrate that subject-matter jurisdiction exists. *Id.* at 394–95. If the pleadings are insufficient to establish jurisdiction but do not affirmatively demonstrate an incurable jurisdictional defect, the plaintiff should be afforded the opportunity to replead. *Id.* at 395. A plea to the jurisdiction should not be granted if a fact issue exists regarding the court's jurisdiction, but if the pleadings affirmatively demonstrate an incurable jurisdictional defect, the plea to the jurisdiction must be granted. *Id.*; *see Miranda*, 133 S.W.3d at 227–28.

A trial court has no discretion and must dismiss the case as a ministerial act when it lacks subject-matter jurisdiction over the dispute. *In re St. Thomas High Sch.*, 495 S.W.3d 500, 506 (Tex. App.—Houston [14th Dist.] 2016, orig.

11

proceeding). Mandamus relief is an appropriate remedy when the trial court acts without subject-matter jurisdiction. *Id.*; *see In re Crawford & Co.*, 458 S.W.3d 920, 929 (Tex. 2015) (per curiam) (granting mandamus relief and stating that because trial court lacked jurisdiction over case, court should have dismissed case). If a trial court lacks subject-matter jurisdiction over the underlying proceedings, the relator need not establish that it lacks an adequate remedy by appeal. *In re St. Thomas High Sch.*, 495 S.W.3d at 514 (stating also that appeal is often inadequate to protect important First Amendment rights relating to free exercise of religion); *In re Godwin*, 293 S.W.3d 742, 747 (Tex. App.—San Antonio 2009, orig. proceeding [mand. denied]) (stating that, generally, trial court's ruling on plea to jurisdiction is not subject to mandamus relief because adequate remedy by appeal often exists, but "appeal is often inadequate to protect the rights of religious organizations when there are important issues relating to the constitutional protections afforded by the First Amendment").

## B. Governing Law

The First Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides in part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." *Westbrook*, 231 S.W.3d at 395 (quoting U.S. CONST. amend. I); *Patton v. Jones*, 212 S.W.3d 541, 546–47 (Tex. App.—Austin 2006, pet. denied).

12

Governmental action may burden the free exercise of religion by interfering with an individual's observance or practice of a particular faith or by encroaching on a church's ability to manage its internal affairs. *Westbrook*, 231 S.W.3d at 395. The Constitution requires that government and religion remain separate and "forbids the government from interfering with the right of hierarchical religious bodies to establish their own internal rules and regulations and create tribunals for adjudicating disputes over religious matters." *Tran v. Fiorenza*, 934 S.W.2d 740, 743 (Tex. App.—Houston [1st Dist.] 1996, no writ).

"Churches have a fundamental right 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Westbrook*, 231 S.W.3d at 397 (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)). "It is a core tenet of First Amendment jurisprudence that, in resolving civil claims, courts must be careful not to intrude upon internal matters of church governance." *Id.* The Free Exercise Clause of the First Amendment thus "precludes civil courts from delving into matters focused on 'theological controversy, church discipline, ecclesiastical government, or the conformity of the members of a church to the standard of morals required of them.'" *Thiagarajan v. Tadepalli*, 430 S.W.3d 589, 594 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (quoting *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713–14 (1976)). "Although wrongs may exist in the ecclesiastical setting,

13

and although the administration of the church may be inadequate to provide a remedy, the preservation of the free exercise of religion is deemed so important a principle it overshadows the inequities that may result from its liberal application." *Williams v. Gleason*, 26 S.W.3d 54, 59 (Tex. App.—Houston [14th Dist.] 2000, pet. denied); *Tran*, 934 S.W.2d at 743.

However, the First Amendment does not necessarily bar all claims that may touch upon religious conduct. *Westbrook*, 231 S.W.3d at 396; *In re Godwin*, 293 S.W.3d at 749 ("[T]here are indeed limits to what can be said by church officials from the pulpit."). Churches, congregations, and church hierarchy "exist and function within the civil community," and therefore they are "amenable to rules governing property rights, torts, and criminal conduct." *Williams*, 26 S.W.3d at 59. "Courts do not have jurisdiction to decide questions of an ecclesiastical or inherently religious nature, so as to those questions they must defer to decisions of appropriate ecclesiastical decision makers." *Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 605–06 (Tex. 2013). But the Texas courts are "bound to exercise jurisdiction vested in them by the Texas Constitution and cannot delegate their judicial prerogative where jurisdiction exists." *Id.* at 606. Thus, the Texas courts decide non-ecclesiastical issues based on the same neutral principles of law applicable to other entities while deferring to religious entities' decisions on ecclesiastical and church polity questions. *Id.* at 596.

14

The determination of whether a suit is ecclesiastical in nature is made by examining the substance and effect of the plaintiff's petition. *Williams*, 26 S.W.3d at 59; *Tran*, 934 S.W.2d at 743 ("The difficulty comes in determining whether a particular dispute is 'ecclesiastical' or simply a civil law controversy in which church officials happen to be involved.").

Here, Nguyen has pled the tort of defamation in the underlying case. Actionable defamation requires proof of (1) publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) that proximately caused damages. *Anderson v. Durant*, 550 S.W.3d 605, 617–18 (Tex. 2018). "Under Texas law, a statement is defamatory if it tends to injure a person's reputation and thereby expose the person to public hatred, contempt, ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation." *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 580 (Tex. App.—Austin 2007, pet. denied); *see also Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 356 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) ("To qualify as defamatory, a statement should be derogatory, degrading, somewhat shocking, and contain elements of disgrace. But a communication that is merely unflattering, abusive, annoying, irksome, or embarrassing, or that only hurts the plaintiff's feelings, is not actionable.").

*C.*     *Analysis*

Nguyen's defamation suit arises out of Hung's alleged statements to Church officers and deacons, made after Nguyen had both stepped down from leadership roles and stopped attending the Church, that Nguyen had committed adultery. Nguyen alleged that his decision not to seek further leadership roles was unrelated to his wife's concern that he had committed adultery, and he alleged that he informed his wife and Hung in a January 2015 meeting that he had not been involved in an extramarital affair. He continued attending the Church without incident until August 2015, when he alleged that he had an argument with Hung about unrelated matters, including the proper form of address in Vietnamese for Hung's wife and perceived criticisms of Hung's pastoral decisions. Nguyen alleged that, as a result of this argument, he did not feel welcome at the Church, and he stopped attending services.

Nguyen alleged that, several weeks later, in September 2015, one of the Church elders questioned Hung about Nguyen's absence, and Hung responded that Nguyen was no longer a deacon and no longer attended services because he had committed adultery with a fellow parishioner. According to Nguyen, this statement by Hung was false. Nguyen alleged that Hung then informed other Vietnamese pastors at a meeting that Nguyen was no longer a member or elder of the Church, although he did not state a reason why, and Hung later informed the Church's deacon

16

board that Nguyen had committed adultery and he had terminated Nguyen's membership in the Church.

Nguyen contacted the C&MA Vietnamese District leadership to resolve the matter but declined the Church leadership's invitation to meet with it. Months later, Nguyen brought this suit for defamation against the Church and Hung. Nguyen alleged that, because of Hung's statements, his reputation had been damaged in the Church and in the greater Vietnamese Christian community, which is extremely close-knit.

In response to the Church's petition for writ of mandamus seeking to vacate the trial court's order denying its plea to the jurisdiction, Nguyen argues that this dispute does not fall within the ecclesiastical abstention doctrine because Hung's statements were not made as a matter of church discipline or church governance, nor were they made for the purposes of conforming the congregation to the standard of morals required of them by the Church. He argues that, instead, Hung's statements were "motivated by personal malice" towards Nguyen arising out of their August 2015 argument. Nguyen argues that, as a result, Hung's statements are not entitled to First Amendment protection under the ecclesiastical abstention doctrine and, thus, the trial court properly denied the Church's plea to the jurisdiction. Nguyen alternatively argues that mandamus relief is improper because there is a factual

17

dispute concerning whether Hung's actions and statements were a matter of church discipline or whether they were made due to Hung's malice towards Nguyen.

### 1.    *Applicable Law*

The United States Supreme Court has held that the Free Exercise Clause of the First Amendment forbids civil courts from exercising jurisdiction over "a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Milivojevich*, 426 U.S. at 713–14; *see also Thiagarajan*, 430 S.W.3d at 594.

Several Texas courts, including the Texas Supreme Court, have addressed the application of the ecclesiastical abstention doctrine to a plaintiff's tort claims, including claims for defamation. In *Westbrook v. Penley*, Penley, a former parishioner, brought several tort claims against Westbrook, the pastor of her former church, including claims for defamation and professional negligence. Penley allegedly informed Westbrook in a marital counseling session that she had had an extramarital affair and Westbrook then informed the church elders of this and published a letter to the congregation concerning Penley's actions and the appropriate discipline of "encourage[ing] the congregation to 'break fellowship' with Penley in order to obtain her repentance and restoration to the church body." 231 S.W.3d at 393–94. Upon Westbrook's plea to the jurisdiction, the trial court

18

dismissed the case on the basis of the ecclesiastical abstention doctrine. *Id.* at 394.

The Fort Worth Court of Appeals affirmed the dismissal of all of Penley's claims

except for the professional negligence claim, "which it held concerned Westbrook's

role as Penley's secular professional counselor and did not invoke First Amendment

concerns." *Id.* The Texas Supreme Court then granted review to determine whether

the trial court had jurisdiction over the professional negligence claim. *Id.* Penley did

not contest the dismissal of her defamation claim in the supreme court.

Penley argued to the supreme court that her professional negligence claim did

not implicate the First Amendment because the courts could resolve the claim using

"neutral tort principles without resorting to or infringing upon religious doctrine,"

as it had permitted for the resolution of disputes over property. *Id.* at 399; *see*

*Milivojevich*, 426 U.S. at 710 (stating that First Amendment requires courts to

determine church property disputes, in that these may be decided "without resolving

underlying controversies over religious doctrine"). The supreme court disagreed that

free exercise concerns would not be implicated even if it were to expand the neutral-

principles doctrine. *Westbrook*, 231 S.W.3d at 399 The court stated:

> A church's decision to discipline members for conduct considered
> outside of the church's moral code is an inherently religious function
> with which civil courts should not generally interfere. Courts have no
> jurisdiction to "revise or question ordinary acts of church discipline"
> and "cannot decide who ought to be members of the church, nor
> whether the excommunicated have been justly or unjustly, regularly or
> irregularly cut off from the body of the church." This is because "the
> judicial eye cannot penetrate the veil of the church for the forbidden

19

purpose of vindicating the alleged wrongs of excised members; when they become members they did so upon the condition of continuing or not as they and their churches might determine, and they thereby submit to the ecclesiastical power and cannot now invoke the supervisory power of the civil tribunals."

*Id.* at 399–400 (quoting *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 730, 731 (1871)).

The court recognized that Penley "pin[ned] Westbrook's liability in this case, at least in part, on his breach of a secular duty by disclosing Penley's confidential information to the church elders in the first instance," but it then noted that "this disclosure cannot be isolated from the church-disciplinary process in which it occurred, nor can Westbrook's free-exercise challenge be answered without examining what effect the imposition of damages would have on the inherently religious function of church discipline." *Id.* The court held that subjecting Westbrook to tort liability for instituting and participating in the church's required disciplinary process would have a "chilling effect" on a church's ability to discipline its members and would "deprive churches of their right to construe and administer church laws." *Id.* The court thus concluded that, although Penley's claim for professional negligence "can be *defined* by neutral principles without regard to religion, the *application* of those principles to impose civil tort liability" would interfere with the church's ability to manage its internal affairs and utilize its disciplinary process. *Id.* (emphasis in original).

The same reasoning applied by the supreme court in *Westbrook* to dismiss Penley's professional negligence claim has been applied by our sister courts under circumstances similar to those in this case to hold that a trial court lacked jurisdiction over a plaintiff's defamation claim.

In *Jennison v. Prasifka*, the Dallas Court of Appeals held that the trial court properly dismissed the tort claims, including a defamation claim, brought by the plaintiff—an Episcopal priest who also served as a stockbroker and who was released from his role as a priest after a parishioner complained to the local diocese about his actions taken with her brokerage account—because the "only defamatory statements allegedly made by [the parishioner-defendant] were made to the church itself in connection with the church's disciplinary process," and the priest's claims were "inextricably intertwined with the church's investigation of his performance as a priest and the discipline imposed by the church for inadequate performance" and therefore "relate[d] to internal matters of church governance and discipline." *See* 391 S.W.3d 660, 667–68 (Tex. App.—Dallas 2013, no pet.).

In *In re Godwin*, the San Antonio Court of Appeals held that the defamation claim of the plaintiff—a former parishioner who sued the pastor and the church after the pastor made a speech before the congregation "marking" the plaintiff for causing division in the church after the plaintiff allegedly offered financial incentives to church employees to speak out about financial improprieties committed by church

21

officials—related to the church's decision to discipline the plaintiff "for conduct it deemed contrary to both their Christian values and their interpretation of the Bible," which was "an inherently religious function with which civil courts should not interfere." 293 S.W.3d at 748; *see also Williams*, 26 S.W.3d at 56, 59–60 (pre-*Westbrook* case in which Fourteenth Court of Appeals determined that plaintiff's defamation suit against church elders based on church's warning to plaintiff—who served as Sunday School teacher—that he stop teaching Biblical interpretations that differed from those of Presbyterian Church was barred under ecclesiastical abstention doctrine because plaintiff's suit would require court "to review the ecclesiastical judicial process and to determine the efficacy of the parties' religious beliefs and practices").

Likewise, in a memorandum opinion in *Becker v. Clardy*, the Austin Court of Appeals addressed whether a defamation claim brought by one teacher at a Catholic school against another teacher should be barred under the ecclesiastical abstention doctrine. *See* No. 03-10-00376-CV, 2011 WL 6756999, at *1 (Tex. App.—Austin Dec. 22, 2011, pet. denied) (mem. op.). Becker, the plaintiff, alleged that the defendant, Clardy, had made several allegedly defamatory statements about him to her students, and that the principal of the school and the pastor of its affiliated church conducted an investigation into the statements, which ultimately stopped, without imposing discipline on Clardy, when Clardy resigned. *Id.*

22

In analyzing whether the trial court properly dismissed the claim under the ecclesiastical abstention doctrine, the Austin Court first noted that "the alleged statements and damage to reputation contained in Becker's pleadings were 'confined' to the church community." *Id.* at *3. The court also noted that the evidence presented in connection with Clardy's plea to the jurisdiction "showed that the substance of Becker's claims was that Clardy had violated the [local diocese's] Policy's code of ethics and moral standards of the Catholic faith and Canon Law." *Id.* at *4. The court concluded that deciding whether to impose tort liability on Clardy "for harm to Becker's reputation within the community then necessarily would require an analysis of internal church matters and doctrine." *Id.* Specifically, the truth or falsity of Clardy's alleged statements and the alleged injury to Becker's reputation within the church "would require an analysis of the church's moral standards and church doctrine." *Id.* The court stated, "Because Becker's alleged harm is limited to the harm to his reputation within the church community, it is measured against the backdrop of the church's religious morals and principles." *Id.* Accordingly, it affirmed the dismissal of Becker's claim. *Id.* at *6. This is the standard we apply in this case.

## 2. *Application of the Law*

The same reasoning held to require dismissal of the plaintiff's case under the ecclesiastical abstention doctrine in *Westbrook*, *Jennison*, *In re Godwin*, *Becker*, and *Williams* requires dismissal of Nguyen's defamation suit in this case.

We disagree with Nguyen's contention that Hung's statements are unrelated to matters of church governance and discipline and do not involve the conformity of the members of a church to the standard of morals required of them. *See Westbrook*, 231 S.W.3d at 399–400. Hung's statements cannot be considered in isolation but must instead be viewed in the context in which they occurred. *See id.* As in *Westbrook*, the Manual for the C&MA contained a "Uniform Policy on Discipline, Restoration, and Appeal," which applies to all elected personnel of C&MA entities and all members of C&MA churches. Referencing biblical text as authority, the policy specifically outlines "the steps which should be taken to resolve conflict and exercise redemptive and restorative discipline in the church."

The record reflects that Hung's statements were made to Church officials charged with church governance as an integral part of a struggle over church governance involving Hung and Nguyen. The struggle arose out of differences of opinion as to how the Church should be governed and charges brought to Hung's attention by Nguyen's wife regarding her husband's alleged violation of moral standards by engaging in an adulterous affair with a church member, a charge which

24

Nguyen denied even as he left the Church and refused an offer by the Church deacons to meet with them to resolve the dispute.

Specifically, Nguyen's suit for defamation against Hung was brought after:

- Nguyen—a founding member of the Church who had served in various leadership roles, including as interim pastor—was replaced by Hung as the new senior pastor;

- Nguyen, two years later, decided to "take a break" from the ministry and not to seek re-appointment to leadership positions;

- Nguyen's wife, Mai, subsequently approached Hung for marital counseling in January 2015, telling him she had seen Nguyen having lunch with two female church members and was concerned about his fidelity;

- Hung met with Nguyen and Mai, and Nguyen defended himself by stating that he had been asked by the other women to provide marital and spiritual guidance to them and was not romantically involved with them;

- All three prayed over the incident, and Hung suggested it should not be mentioned again;

- Hung and Nguyen began having conflicts concerning other issues within the Church in August 2015, including Hung's decision to take a month-long trip to Vietnam without informing the Church leadership;

- Hung told Nguyen in a phone call that Nguyen's and Mai's criticism of Hung's way of pastoring to Church members had caused emotional hurt and offended Hung and other Church members;

- Nguyen subsequently "decided to take a break from attending the Church";

- Hung responded to a Church officer's question several weeks later as to why Nguyen no longer attend services at the Church by saying that it was because Nguyen had committed adultery with a woman in the church;

25

- Hung told Vietnamese pastors at a pastors' meeting in Austin in September 2015 that Nguyen was no longer a member of the Church without stating why when Nguyen believed he was still a member of the Church;

- Hung allegedly informed all of the deacons of the Church that Nguyen had committed adultery with fellow Church members;

- Nguyen contacted members of the C&MA Vietnamese District leadership in an attempt to solve the matter, but the district took no action; and

- Nguyen declined invitations from the Church's leadership to meet and discuss the problems and informed the deacon board that Hung had violated the law by slandering him and that he "wanted the Church to be at peace and for things to settle down."

Nguyen chose not to allow the deacons of the Church to resolve the issue and instead sued Hung for damages for defamation.

Under these circumstances, all of the witnesses in this case would be Church members or officers responding to allegations relating to the proper governance of the Church, the standard of morals expected of Church leadership, the basis for Nguyen's wife's allegations to Hung that her husband had committed adultery, and the truth of Hung's explanation for why Nguyen left the Church. This is precisely the type of situation covered by the disciplinary policy set out in the C&MA Manual. Ignoring the Manual, this suit would leave it to the state district court to decide whether Nguyen left the Church voluntarily, as he states, or was asked to resign his leadership positions and to leave as a matter of church discipline to resolve conflicts within the Church, conflicts that Nguyen refused to have resolved by the church

26

elders and deacons. And it would require the district court to inquire into whether Hung was properly following Church disciplinary procedure when he made the statements concerning Nguyen to the Church deacons.

It is hard to see by what criterion the matters Nguyen would have the state courts resolve are *not* consigned by the ecclesiastical abstention doctrine to ecclesiastical bodies rather than to the secular courts. *See Milivojevich*, 426 U.S. at 718–20 (upholding exclusive church jurisdiction over defrocking of bishop and finding state court's "detailed review" of evidence impermissible under First and Fourteenth Amendments and compounded by state court's errors in evaluating evidence, delving into church constitutional provisions, and sanctioning circumvention of tribunals set up to resolve internal church disputes); *Westbrook*, 231 S.W.3d at 399–400 (holding that free exercise concerns required dismissal of suit for professional negligence that had given rise to disciplinary process covered by church policy); *Mouton v. Christian Faith Missionary Baptist Church*, 498 S.W.3d 143, 150–51 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (holding that claims were "inextricably intertwined" with selection of church's new pastor and church's expulsion of members, two "inherently ecclesiastical" issues, and thus granting plea to jurisdiction was proper); *Jennison*, 391 S.W.3d at 667–68 (holding that allegedly defamatory statements were made "to the church itself in connection with the church's disciplinary process" relating to performance of priest); *In re*

27

*Godwin*, 293 S.W.3d at 748–49 (holding that defamation claim was barred under ecclesiastical abstention doctrine because claim related to church's decision to discipline former member for conduct contrary to values and Biblical interpretation).

We conclude that Hung's allegedly defamatory statements are likewise "inextricably intertwined" with matters relating to an internal struggle between a current and former leader of the Church over Church governance, the standard of morals required of leaders of the Church, and the reason for Nguyen's leaving or being expelled from the Church.

Nor do we agree with Nguyen and with the dissent that there is a factual dispute over whether Hung's actions and statements were a matter of church discipline or whether they were due to Hung's malice, taking them out of the category of a legal determination and requiring trial. Even if there is a dispute over Hung's motivation in making the statements—either as part of a disciplinary procedure due to the alleged adultery or merely out of vindictiveness towards Nguyen, who had criticized Hung's pastoring decisions—these statements were made in the context of expelling a member and former leader of the Church, or, alternatively, the Church member's voluntarily quitting his leadership positions and quitting the Church—and then refusing to meet with Church leadership to resolve the dispute—either version of which is inherently an ecclesiastical concern as a matter of law. *See Mouton*, 498 S.W.3d at 151 ("[D]iscipline of church members,

28

including expulsion, is an 'inherently religious function with which civil courts should not generally interfere.'").

Furthermore, although Nguyen contends that his reputation in the Church and in the Vietnamese Christian community was damaged by Hung's statements, there is no allegation that Hung's statements were made outside the context of explaining Nguyen's absence from the Church in response to a question from a Church elder and in Hung's explanation to the Church's deacon board on why Nguyen was no longer a member or elder of the Church. Nguyen's complaint that his reputation was harmed is clearly a harm alleged to have occurred within the Church community. *See Becker*, 2011 WL 6756999, at *4 ("Because Becker's alleged harm is limited to the harm to his reputation within the church community, it is measured against the backdrop of the church's religious morals and principles."). Nor is it evident what damages Nguyen might have suffered other than with respect to his affiliation with the Church.

Additionally, to the extent that Nguyen complains that, by waiting eight months after learning of the adultery allegations before making any statements to the Church elders and deacons, Hung failed to comply with the Church's prescribed procedures for handling the discipline of members, the question of whether the Church properly followed its disciplinary procedures is not a matter than can be adjudicated by the secular courts. *See Milivojevich*, 426 U.S. at 718–19 (holding that

29

state court erred by addressing defrocked bishop's claims that church's actions contravened church procedures and by addressing bishop's failure to participate in disciplinary proceedings); *Singh v. Sandhar*, 495 S.W.3d 482, 490, 492 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (noting that civil courts cannot entertain claims that ecclesiastical procedures were arbitrary and that temple's alleged failure to follow its bylaws "on a matter of internal governance involves ecclesiastical concerns"); *Williams*, 26 S.W.3d at 59 (stating that civil courts are prohibited "from inquiring into any phase of ecclesiastical decision making—its merits as well as procedure").

Finally, Nguyen cites *In re Godwin* for the proposition there are limits to what religious leaders can say without running afoul of defamation laws and that "an accusation of inappropriate sexual behavior would likely not be protected." While Nguyen is correct that the San Antonio Court of Appeals stated in *In re Godwin* that "there are indeed limits to what can be said by church officials from the pulpit," to the extent Nguyen argues that statements concerning inappropriate sexual behavior can never be protected under the ecclesiastical abstention doctrine, Nguyen both ignores the controlling law recited above and reads *In re Godwin* too broadly. *See* 293 S.W.3d at 749. *In re Godwin* concerned a disgruntled former church member who made repeated comments and accusations that the church's leadership was engaged in financial misconduct, and the member's conduct included making offers

30

of financial assistance to church employees who spoke out against the church and then lost their positions as a result. *Id.* at 745–46. The church's senior pastor, on advice from the board of elders, read a statement to the congregation describing the church member's behavior, accusing the member of bribery, and "marking" the member as one causing division within the church. *Id.* at 746. At oral argument before the San Antonio Court of Appeals, the church's counsel took the position that the church officials would be protected under the ecclesiastical abstention doctrine "even if they had stated [the member] were a child molester." *Id.* at 749. The San Antonio Court then stated that, under the facts of the particular case, "an accusation of inappropriate sexual behavior would likely not be protected." *Id.*

We do not read the court's opinion in *In re Godwin* as making a blanket statement that allegations of "inappropriate sexual behavior" made by church officials can never be protected under the ecclesiastical abstention doctrine. Instead, we read the opinion as stating that, under the facts of that case, which involved allegations of financial impropriety, allegations that the member engaged in inappropriate sexual behavior would likely be beyond the scope of the doctrine's protection. *See also Patton*, 212 S.W.3d at 554–55 & n.13 (noting, in defamation case arising out of decision to terminate employment of youth minister, that absent "unusual or egregious circumstances" surrounding statements, defamation cases generally fall within ecclesiastical abstention doctrine).

Nguyen also argues that this case is analogous to the Fifth Circuit's decision in *Sanders v. Casa View Baptist Church*, in which the court held that the First Amendment "does not categorically insulate religious relationships from judicial scrutiny, for to do so would necessarily extend constitutional protection to the secular components of these relationships." 134 F.3d 331, 335–36 (5th Cir. 1998). *Sanders* involved a pastor who conducted marital counseling sessions with some of his parishioners. *Id.* at 334. Although the pastor did provide marital counseling to the two plaintiffs, one of whom was an administrative secretary at the church and the other of whom was eventually hired as a receptionist at the church, he also entered into a sexual relationship with both plaintiffs. *Id.* After the plaintiffs ended their counseling relationship with the pastor, he began "to criticize their work performance and discourage their hopes of promotions," and he also "engaged in behavior and conversation of a sexual nature that was unwelcome at the time." *Id.*

The Fifth Circuit disagreed with the pastor's claims that he was entitled to judgment as a matter of law because he occasionally discussed scripture with the plaintiffs during their counseling sessions and therefore the sessions were not purely secular, they were "inherently ecclesiastical" and because the plaintiff's claims were "in essence noncognizable claims for 'clergy malpractice.'" *Id.* at 335. The Fifth Circuit held that for the pastor to "invoke the protection of the First Amendment for conduct taking place within his counseling relationships with the plaintiffs," he was

required to "assert that the specific conduct allegedly constituting a breach of his professional and fiduciary duties was rooted in religious belief." *Id.* at 337–38. The court then noted "the obvious truth that the activities complained of by the plaintiffs"—intentional sexual misconduct with the plaintiffs—"were not part of his religious beliefs and practices." *Id.* at 338. The Fifth Circuit thus held that the pastor was not entitled to judgment as a matter of law on the basis that the plaintiffs' claims were barred by the First Amendment and the ecclesiastical abstention doctrine. *Id.*

In *Westbrook*, however, the Texas Supreme Court distinguished *Sanders*, noting that *Sanders* "involved an intentional tort that formed no part of the pastor's or his church's religious beliefs or practices." *See* 231 S.W.3d at 403. We likewise find *Sanders*—which involved intentional torts committed in the context of the provision of professional counseling services and did not involve matters of church discipline and governance—distinguishable from this case. This is not a case of professional malpractice but a case of whether Nguyen was disciplined by Hung for alleged sexual misconduct and accordingly whether Hung told the truth to Church leadership when he said that Nguyen left the Church for that reason and, if not, whether his statement was defamatory, and whether the matter should have been handled by Church authorities under principles regarding the conformity of all concerned to the standards of morals established by the Church. *See Milivojevich*, 426 U.S. at 713–14 (holding that "the civil courts exercise no jurisdiction . . . in a

33

matter which concerns . . . the conformity of the members of the church to the standard of morals required of them"); *Thiagarajan*, 430 S.W.3d at 594 (same).

We conclude that Nguyen's defamation claim against Hung and the Church necessarily involves ecclesiastical matters that should be resolved within the church itself rather than the civil courts. We hold, therefore, that the ecclesiastical abstention doctrine applies to this claim and that the trial court erred by denying the Church's plea to the jurisdiction.

Because we hold that the trial court lacks subject-matter jurisdiction over this case, the Church need not demonstrate that it lacks an adequate remedy by appeal. *See In re St. Thomas High Sch.*, 495 S.W.3d at 514; *In re Godwin*, 293 S.W.3d at 747.

We sustain the Church's sole issue.

## Conclusion

We conditionally grant the Church's petition for writ of mandamus and direct the trial court to vacate its order denying the Church's plea to the jurisdiction. The writ will only issue if the trial court fails to comply. Further, we lift the stay of trial court proceedings entered by this Court on August 9, 2018.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Landau.

Justice Landau, dissenting.