

In The
Court of Appeals
Seventh District of Texas at Amarillo

No. 07-19-00307-CV

IN RE DIOCESE OF LUBBOCK, RELATOR

ORIGINAL PROCEEDING FOR WRIT OF MANDAMUS

December 6, 2019

OPINION

Before QUINN, C.J., and PIRTLE and PARKER, JJ.

"Render therefore unto Caesar the things which are Caesar's; and unto God the things that are God's."[1]  The biblical verse captures the inherent conflict long existent between civil and religious authority.  We now address an aspect of that conflict raised through the ecclesiastical abstention doctrine.

Jesus Guerrero sued the Diocese of Lubbock for allegedly defaming and intentionally inflicting emotional distress upon him.  The accusations underlying both causes of action concern the Diocese's publication of a list entitled "Names of All Clergy with a Credible Allegation of Sexual Abuse of a Minor."  Guerrero, a former deacon with the Diocese, found his name on the list.  The Diocese moved to dismiss the action under § 27.001 *et seq.* of the Texas Civil Practice and Remedies Code.  So too did it file a plea to the jurisdiction of the 237th District Court, Lubbock County.  Both motions were denied.

---

[1] *Matthew* 22:21.

That resulted in the Diocese asking us to review the motion to dismiss via a separate interlocutory appeal and the plea to the jurisdiction through a petition for writ of mandamus. We address the latter here. In it, the Diocese asks us to issue the equitable writ to direct the Honorable Les Hatch, presiding judge of 237th Judicial District Court, to "vacate the trial court's denial of its plea to the jurisdiction, and reverse and render judgment granting the plea to the jurisdiction."[2] We deny the petition.

*Abstention Doctrine and Subject-Matter Jurisdiction*

Mandamus is an extraordinary remedy available only in limited situations. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding); *In re Talley*, No. 07-15-00198-CV, 2015 Tex. App. LEXIS 6268, at *3–4 (Tex. App.—Amarillo June 22, 2015, orig. proceeding) (mem. op.). Its small umbrella, though, extends over jurisdictional disputes. *In re Torres,* No. 07-19-00220-CV, 2019 Tex. App. LEXIS 6516, at *2-3 (Tex. App.—Amarillo July 30, 2019, orig. proceeding) (mem. op.); *In re Alief Vietnamese Alliance*, 576 S.W.3d 421, 428 (Tex. App.—Houston [1st. Dist.] 2019, orig. proceeding). Within such disputes lie questions about the effect certain religious liberties have upon a trial court's subject-matter jurisdiction. *See,* e.g.*, Westbrook v. Penley*, 231 S.W.3d 389, 394 (Tex. 2007) (stating that a lack of jurisdiction may be raised through a plea to a court's jurisdiction when religious-liberty grounds form the basis of the jurisdictional challenge); *In re Torres*, 2019 Tex. App. LEXIS 6516, at *3. And, such is the dispute here. The Diocese posits that the ecclesiastical abstention doctrine bars the trial court from adjudicating Guerrero's lawsuit. In refusing to dismiss it, the trial court allegedly abused

---

[2] We interpret the request as one asking that we direct the trial court to 1) vacate its order and 2) enter another dismissing the suit. Through a writ of mandamus, we do not substitute our order for that of the trial court. Instead, we assess the accuracy of the trial court's decision and, if inaccurate, direct it to enter the order it should have.

2

its discretion. *See In re Navajo Nation*, ___ S.W.3d ___, ___, 2019 Tex. App. LEXIS 8224, at \*9-10 (Tex. App.—Amarillo Sept. 10, 2019, orig. proceeding) (stating that mandamus is appropriate when the relator shows that the trial court clearly abused its discretion and lacked an adequate legal remedy).[3]

We recognized in *In re Torres*, 2019 Tex. App. LEXIS 6516, that the doctrine may indeed deprive trial courts of jurisdiction to adjudicate certain civil actions and entitle an ecclesiastical entity to a writ of mandamus. *See id.* at \*6-7. It all depends upon whether the factual circumstances underlying the causes of action fall within the doctrine's scope.

Generally speaking, the ecclesiastical abstention doctrine bars civil courts from adjudicating matters concerning theology, theological controversy, church discipline, ecclesiastical government, and compliance with church moral doctrine. *Reese v. Gen. Assembly of Faith Cumberland Presbyterian Church in Am.*, 425 S.W.3d 625, 629 (Tex. App.—Dallas 2014, no pet.). Though easily described, its application and scope are the source of debate. This is so because the doctrine does not necessarily bar civil courts from adjudicating all controversies touching sectarian interests. *In re First Christian Methodist Evangelistic Church*, No. 05-18-01533-CV, 2019 Tex. App. LEXIS 8045, at \*12 (Tex. App.—Dallas Aug. 30, 2019, orig. proceeding) (mem. op.); *In re St. Thomas High Sch.*, 495 S.W.3d 500, 507 (Tex. App.—Houston [14th Dist.] 2016, orig. proceeding). After all, religious entities, like the coins of Caesar, co-exist within the secular world.

Several years ago, our Texas Supreme Court provided a framework to utilize when parsing through the debate. We were told, in *Masterson v. Diocese of Nw. Tex.*, 422

---

[3]A relator need not illustrate that he lacks an adequate legal remedy if the trial court lacks jurisdiction over the suit. *In re Alief Vietnamese Alliance*, 576 S.W.3d at 428.

S.W.3d 594 (Tex. 2013), to apply the neutral principles methodology. *Id.* at 596; *In re Torres*, 2019 Tex. App. LEXIS 6516, at *3 (so acknowledging). It better conforms to a court's constitutional duty to decide disputes within their jurisdiction while respecting limitations imposed by those provisions in the First Amendment of the United States Constitution concerning religion. *Masterson,* 422 S.W.3d at 596. Per that methodology, courts have the jurisdiction to determine non-ecclesiastical issues based on the neutral principles of law applicable to other entities. *Id.* Falling outside that jurisdiction, though, are decisions by religious entities on ecclesiastical and church polity questions; those we leave to the ecclesiastical authority making them. *Id.* However, this is another test more easily described than applied. As acknowledged in *Masterson*, the difference between ecclesiastical and non-ecclesiastical issues will not always be distinct. *Id.* at 606. Indeed, the resolution of non-ecclesiastical matters may sometimes impinge on church operations to some degree. *See id.* (stating that many disputes of the type there before the court, i.e., property ownership after a church schism, will require courts to analyze church documents and organizational structures to some degree).

Normally, matters of religion or theology, church discipline, church governance, church membership, and the conformity of those members to church precepts are ecclesiastical in nature and outside the jurisdiction of civil courts. *See Westbrook v. Penley*, 231 S.W.3d at 397-98; *Jennison v. Prasifka*, 391 S.W.3d 660, 665 (Tex. App.— Dallas 2013, no pet.); *accord In re Torres*, 2019 Tex. App. LEXIS 6516, at *5-6 (listing the areas deemed ecclesiastical by our sister courts). Yet, as said in *Hubbard v. J Message Grp. Corp.*, 325 F.Supp.3d 1198 (D.N.M. 2018), "nuances," "context and . . . subtle distinctions in the context" play an important role, as well. *Id.* at 1213-14. For instance, in *Westbrook*, a pastor directed his congregation, via letter, to 1) shun Penley for engaging

4

in a "'biblically inappropriate'" relationship and 2) "treat the matter as a 'members-only issue, not to be shared with those outside [the congregation].'" *Westbrook,* 231 S.W.3d at 393. The revelation about the "inappropriate" relationship occurred when Penley told Pastor Westbrook of same during a counseling session. *Id.* The pastor's letter resulted in Penley suing Westbrook for defamation and professional negligence. All but the professional negligence claims were dismissed by the trial court. Ultimately, our Supreme Court held that the negligence claim also had to be dismissed. This was so because "[a]ny civil liability that might attach for Westbrook's violation of a secular duty of confidentiality in this context would in effect impose a fine for his decision to follow the religious disciplinary procedures that his role as pastor required and have a concomitant chilling effect on churches' autonomy to manage their own affairs." *Id.* at 402.

The court observed that Westbrook's disclosure was grounded in religious doctrine concerning a three-step disciplinary process. *Id.* at 404. An "integral part" of that doctrine required disclosure to church elders, that is, "to 'tell it to the church.'" *Id.* Furthermore, "[t]he letter itself was disseminated to the congregation as the final step in the process," that process being "'[t]hrough their continuing sin, they forfeit their membership in the church, and members of the church are to break fellowship with them.'" *Id.* That Westbrook's action was founded upon church tenet obligating church members to respond in a particular way to the discovery of a particular act was incremental to the decision by the Supreme Court.

Then, we have *Turner v. Church of Jesus Christ of Latter-Day Saints*, 18 S.W.3d 877 (Tex. App.—Dallas 2000, pet. denied). It involved a missionary trip by Turner undertaken as part of his religious duty. The church ended it early due to Turner purportedly encountering emotional or mental problems. Turner sued the church alleging

5

multiple causes of action including defamation. But since the facts underlying those claims implicated church practice and procedure, most were dismissed for want of jurisdiction. The defamation claim was not, though. It arose from the disclosure of medical records to Turner's grandparents. In explaining why it survived, the court initially observed that while "the First Amendment prohibits government regulation of the information a religious organization chooses to record concerning its members, the government may regulate the organization's use of that information if the regulation would not actively involve the government in the organization's internal affairs, religious practice, or religious doctrine." *Id.* at 896. Then, it noted that the church failed to explain how the disclosure of Turner's medical records to his grandparents "concern[ed] the internal policies of the Church or matters of faith or ecclesiastical doctrine." *Id.* Also absent was any explanation about "how resolution of the claim would actively involve the government in the Church's religious activities or excessively entangle the government with religion." *Id.* Consequently, the First Amendment of the United States Constitution did not bar the defamation claim. *Id.* What we see from *Turner* is the importance of indicia such as the reason for the disclosure and the interrelationship between that reason and the church's internal affairs, religious practice, and doctrine.

The *Turner* court is not alone in assigning weight to the identity of those told information and their relationship to the church. In *Jennison*, 391 S.W.3d at 668, the reviewing court held that the facts underlying the claim of defamation concerned discipline imposed by the church upon a priest for inadequate performance. Their adjudication necessarily required inquiry into canon law, the application of church policy, and the church's assessment of the complainant's fitness to perform his religious duties. *Id.* Thus, the ecclesiastical abstention doctrine applied to the claims. Yet, before so holding,

6

the court took care to mention that "[t]he only defamatory statements allegedly made . . . were made to the church itself in connection with the church's disciplinary process." *Id.* Jennison made "no allegation the allegedly defamatory statements were made in any other forum." *Id.* In other words, the injurious act arose from historically ecclesiastical conduct, namely engaging in the internal discipline of clergy, that remained internal.

Similarly, in *Patton v. Jones*, 212 S.W.3d 541 (Tex. App.—Austin 2006, pet denied), the reviewing court held the abstention doctrine barred the defamation suit Patton commenced against the church and various of its clergy. He was the director of youth ministries and was terminated from the job due to allegedly inappropriate conduct. *Id.* at 545-46. In holding as it did, the court applied a three-prong test first announced in *Heard v. Johnson*, 810 A.2d 871 (D.C. App. 2002). *Id.* at 554-55. Those prongs consisted of whether 1) the claim flowed entirely from an employment dispute between the church and its pastor rendering it impractical to separate the claim from the church's decision as to its pastor, 2) the publication was confined within the church, and 3) there existed unusual or egregious circumstances. *Id.* (quoting *Heard, 810 A.2d at 885).* Patton's claim 1) flowed entirely from an internal employment dispute between the church and its pastor, 2) involved a publication confined within the church, and 3) implicated no unusual or egregious circumstances surrounding the comments. So, as in *Jennison*, the source of Patton's claim emanated from historically ecclesiastical conduct confined within the body having the duty to undertake that conduct. The civil courts were barred for entertaining it.

*Kelly v. St. Luke Comm. United Methodist Church*, No. 05-16-01171-CV, 2018 Tex. App. LEXIS 962 (Tex. App.—Dallas Feb. 1, 2018, pet. denied) (mem. op.), also involved a suit filed by a terminated church employee. So too was the ecclesiastical doctrine the

7

reason why all but one cause of action was dismissed; the one claim retained was that of defamation. *Id.* at *2. The injurious act underlying the claims consisted not only of statements to church members but also communications to "persons outside the church" and non-church members witnessing the injurious act. *Id.* at *25. Those circumstances led the court to hold that "the ecclesiastical abstention doctrine applie[d] to all of Kelly's claims other than the portion of her defamation claim in which she asserts she was defamed by the alleged publication of the statements described above to persons outside the church." *Id.* at *26-27. So, like *Turner,* while the injurious act arose from historically ecclesiastical activity, it lost protection when it escaped the internal confines of the religious entity performing it. *See also, Hubbard*, 325 F.Supp.3d at 1219 (holding that because the alleged defamations were published exclusively to the church membership, "this fact strengthens the [Court's] conclusion that Plaintiff's claims, having occurred in the context of an ecclesiastical dispute . . . are barred by the First Amendment"); *Pfeil v. St. Matthews Evangelical Lutheran Church,* 877 N.W.2d 528, 541 (Minn. 2016) (involving statements made by pastors during a formal church disciplinary proceeding and stating that "on the facts before us—where ministers made largely religious and doctrinal allegations as part of an excommunication proceeding and only disseminated those statements to members of the congregation—'the First Amendment has struck the balance for us'"); *Kliebenstein v. Iowa Conf. of the United Methodist Church*, 663 N.W.2d 404, 407 (Iowa 2003) (stating that 1) "[t]he fact that Swinton's communication about Jane was published outside the congregation weakens this ecclesiastical shield," 2) "otherwise privileged communications may be lost upon proof of excess publication or publication 'beyond the group interest,'" and 3) "if publication solely to church members justifies ecclesiastical status for otherwise defamatory communications, proof of publication to

8

*non*-church members arguably supports the opposite conclusion") (emphasis in original); *Ex parte Bole*, 103 So. 3d 40, 59-60 (Ala. 2012) (in barring prosecution of the claim, the court observed that 1) the "statement of which [Trice] complained related to the ostensible reason for his termination, conveyed from the pastor to a member of the congregation concerning the conduct of another member" and 2) "[a]t least one court has specifically held that statements by and between church members 'relat[ing] to the Church's reasons and motives for terminating [parishioners'] membership' 'require an impermissible inquiry into Church disciplinary matters'").

A common thread runs through the authority just cited. A religious body exposing matters historically deemed ecclesiastical to the public eye has consequences. The action leaves the area of deference generally afforded those bodies and enters the civil realm. This is not to say that such a publication alone is always enough, but it is a pivotal nuance. Indeed, arguing that a dispute remains an internal ecclesiastical or church polity issue after that body chooses to expose it publicly rings hollow. And, that is the situation here.

Guerrero's claims arise not from the decision of the Diocese to discipline a deacon for engaging in inappropriate sexual activity. That had been done years earlier with its most recent effort having culminated in 2009. Instead, they arise from a decision made some nine to ten years later "to release the names of clergy who have been credibly accused of sexual abuse of a minor." A list was developed containing those names, and Guerrero's name appeared on it. The Diocese not only incorporated the list into a message describing its purpose and inviting those who may have suffered from such abuse to contact the Diocese but also posted it on its website accessible by the general public. The posting occurred on January 31, 2019.

The Diocese then accompanied its internet post with a press release. Through the press release dated January 31, 2019, the body announced to local media that it joined other Catholic Dioceses in Texas in "releas[ing] names of clergy who have been credibly accused of sexually abusing a minor." It continued with: "[t]he bishops' decision was made in the context of their ongoing work **to protect children** from sexual abuse, and their efforts to promote healing and a restoration of trust in the Catholic Church." (Emphasis added). Also referred to within the release was a letter from the bishop of the Lubbock Diocese. In the letter, the bishop said that "the administrations of our dioceses are serious about ending the cycle of abuse in the Church **and in society at large**, which has been allowed to exist for decades." (Emphasis added). "The scourge of abuse must be stopped," wrote the bishop.

News coverage followed. In one instance, a local television station aired a segment announcing that "four priests . . . and one deacon have credible allegations against them . . . of sexual abuse against **children** . . . according to the Lubbock Diocese." (Emphasis added). Guerrero again was mentioned as one of the group. Following that pronouncement were snippets from a chancellor of the Diocese. The snippets included the chancellor 1) explaining that the reason the names were not released "sooner" was "bishops at the time wanted to keep church issues . . . within the church," 2) saying that "we felt that whatever was handled within the church as far as church punishment was concerned needed to remain in the church," and 3) revealing that though relevant names initially were disclosed to church members, "they weren't made public." The same church

representative also sought to assure that "the church *is* safe **for children**."[4] (Emphasis added).

Another media outlet reported on the release as well. It alluded to an interview held with the bishop of the Lubbock Diocese several months earlier, in October of 2018. The bishop was quoted as saying in that earlier interview: "[i]t's time we need to be honest about these kinds of matters and **society** hasn't always been open and honest about those." (Emphasis added). He also conceded that the church itself had "maybe done some concealing of such things," too.

As can be seen, what began years earlier as an exercise in internal church discipline evolved into an effort at transparency broadcast worldwide through the media and internet. Though somewhat confessional in tone, the event was utilized by the Diocese, according to one or more church representatives, as opportunity to address sexual abuse against "children," help victims of sexual abuse, assuage public concern about the safety of "children" in the church, and criticize both the church and "society" for not "always [being] open and honest about" the topic of sexual abuse.

What we have before us is not an incidental public disclosure of internal church disciplinary matter. Nor was the information leaked to the public via the media by individuals lacking permission to do so. *See In re Godwin*, 293 S.W.3d 742, 745-46 (Tex. App.—San Antonio 2009, orig. proceeding) (wherein an ex-employee of the church gave a local newspaper the church's financial information without permission of the church). Nor did it involve reiteration outside the church of purported statements uttered within

---

[4] In the interview with the local station, the Chancellor also alluded to "the age of the victim" and families not wanting "the embarrassment for themselves and their children" when explaining why "parents" do not want information released and why legal action is not commenced in the "court system."

church confines, such as in a sermon or message directed to church members.  *See id.* at 746 (where the utterance at issue was made to those attending church services and from the pulpit).[5]  That the Diocese posted the list on a website accessible by the public at-large and brought attention to the list and its accessibility through use of local news media distinguishes the circumstances at bar from *Penley*, *Jennison*, *Patton,* and every other judicial opinion we encountered (or the Diocese cited) that imposed the ecclesiastical abstention doctrine as a bar.

There is also another bit of nuance distinguishing our situation from the foregoing authority.  It is the interjection into the discussion of more than simply the misconduct of those related to the church.  The church's statements that 1) "our dioceses are serious about ending the cycle of abuse in the Church and ***in society at large***, which has been allowed to exist for decades" and 2) "[i]t's time we need to be honest about these kinds of matters ***and society hasn't always been open and honest*** about those."  (Emphasis added).  They reveal 1) an acknowledgement that the issue necessitating attention (i.e., sexual abuse) is more than a church matter but rather one of society at-large, 2) an intent to induce society at-large to address the issue, and 3) an intent to join society at-large in the effort.  So, admonishing, inducing, and joining society at-large is telling.  Those indicia provide further basis dispelling any nexus between the Diocese's conduct and any theological, dogmatic, or doctrinal reason for engaging in it.  The same is also true

---

[5] Even the court in *Godwin* hesitated when it came to holding that everything said from the pulpit is insulated from consideration by civil courts.  *In re Godwin*, 293 S.W.3d at 749 (stating that "[c]ase law instructs us that there are indeed limits to what can be said by church officials from the pulpit" and "an accusation of inappropriate sexual behavior would likely not be protected").

regarding any nexus between the decision to go public and the internal management of the church.

Finally, underlying Guerrero's claim of defamation and infliction of emotional distress is more than simply a disagreement about the meaning of a religious term imbedded in canon law, as the Diocese would have us conclude.[6]  He avers that the church labelled him a "child molester," given the context of the publication.  That context is not the definition of "minor" printed in a retraction posted months later.  It is the Diocese using the word "minor" at the same time 1) its chancellor tells the media and public that "the church \*is\* safe for **children**" and 2) it represents in a press release that disclosing the names was made "in the context of . . . ongoing work to protect **children** from sexual abuse."  (Emphasis added).  And, the Diocese has not cited us to, nor does it argue that, those of its representatives invoking the word "children" were relying on, at the time, some bit of canon law or theological tenet that includes adults within the category.

Whether one is defamed depends on evaluating not only the statement uttered but also its context or surrounding circumstances based upon how a person of ordinary intelligence would perceive it.  *See Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 794-95 (Tex. 2019) (directing the use of context); *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 439 (Tex. 2017) (directing consideration of the surrounding circumstances).   Canon law is not in play.

What is in play is how a person of ordinary intelligence would perceive the accusation that Guerrero sexually abused a "minor" when the church accompanied the word with references to abuse involving "children" and the safety of children.   For

---

[6] Apparently, canon law defines "minor" as including all people lacking the ability to reason.  The individual Guerrero supposedly abused was an adult allegedly within that description.

instance, it mattered not that the name "Satan" and the phrase "in the spirit of Satan" may have had sectarian meaning in *Kliebenstein*. Because both also had secular meaning, the court in *Kliebenstein* held that it was improper to dismiss Kliebenstein's defamation suit when the comparisons of her with Satan left the confines of the church. *Kliebenstein*, 663 N.W.2d at 408. Both "minor" and "child" have secular meaning to a person of ordinary intelligence. That either may have sectarian meaning, as well, does not mandate application of the ecclesiastical abstention doctrine.

To quote from *Westbrook,* "the First Amendment does not necessarily bar all claims that may touch upon religious conduct." *Westbrook*, 231 S.W.3d at 396. Secular courts are not barred from adjudicating all controversies touching sectarian interests. That is the situation here. The Diocese, like the churches in *Kliebenstein*, *Kelly*, and *Turner*, placed the controversy in the realm of Caesar or the secular world by opting to leave the confines of the church. Thus, the secular court in which Guerrero sued is not barred from adjudicating the matter.

We deny the petition for writ of mandamus.


Brian Quinn
Chief Justice

14